In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana




______________________________




No. 06-01 -00140 -CR


______________________________






BERNARD JOHN MANTZKE, Appellant




V.




THE STATE OF TEXAS, Appellee





 



On Appeal from the 124th Judicial District Court


Gregg County, Texas


Trial Court No. 28379-B





 









Before Grant, Ross, and Cornelius,* JJ.

Opinion by Justice Grant





______________

*William J. Cornelius, Chief Justice, Retired, Sitting by Assignment



O P I N I O N




 Bernard John Mantzke appeals his conviction for possession of methamphetamine in an amount of four grams or more, but
less than 200 grams, with intent to deliver. Mantzke filed a Motion to Suppress the methamphetamine, which the trial
court overruled after a hearing. He then pleaded guilty before the trial court without a plea bargaining agreement. The
punishment range for the offense was enhanced, under the habitual offender statute, by the trial court's finding that Mantzke
had two prior felony convictions and that the second conviction was for an offense that occurred after the first conviction
became final. See Tex. Pen. Code Ann. § 12.42(d) (Vernon Supp. 2002). The trial court sentenced Mantzke to twenty-five
years' imprisonment.

 On appeal, Mantzke contends the trial court erred in overruling his Motion to Suppress. At the suppression hearing,
Officer Chad Walls testified as follows: Around 10:00 a.m., he received information from his dispatcher that the driver of
a light blue four-door car with Oklahoma Indian Nation license plates was suspected of driving while intoxicated. The
driver was reported to be traveling eastbound on Interstate 20 at the 583 milepost marker. 

 Walls waited at milepost marker 589, spotted a car conforming to the description the dispatcher provided, and confirmed it
had Oklahoma Indian Nation license plates. When he first saw the car, "it was half way on the shoulder and half way on
the main traveled roadway." The car remained over the shoulder for "three -- four seconds" before returning to the traveled
roadway. (1) He followed the car for about five minutes and witnessed it again veer onto the shoulder and back into the
roadway. 

 Walls initiated a traffic stop, approached the car, which Mantzke was driving, and noticed Mantzke was holding "a torch
type lighter in his [left] hand." Walls testified these types of lighters are used for heating certain narcotics. 

 Mantzke was unable to provide a driver's license or proof of insurance and explained that his billfold, his driver's license,
and all of his money had been stolen from a convenience store down the road. Mantzke identified himself as Ricky Ray
Stamper. 

 Walls asked Mantzke to exit his car, patted him down "for [Walls's] safety," and discovered a large bulge in Mantzke's
right pants pocket. He asked Mantzke what he had in his pocket, and Mantzke removed $115 in cash. Walls became
suspicious because Mantzke had just told him all his money had been stolen. 

 Regarding Mantzke's possible intoxication, Walls testified he did not smell any alcohol on Mantzke and did not detect that
Mantzke was walking strangely. He also did not ask Mantzke to take a field sobriety test. He further admitted that in the
course of the encounter, he did not develop probable cause to arrest Mantzke, but would have written him a citation for
failing to have his driver's license. Nevertheless, he had not completely ruled out that Mantze was intoxicated. 

 Walls testified that Mantzke was very nervous, was shaking, and was "hesitant to tell me anything." He asked Mantzke if
he could search his car, and Mantzke at first refused, telling Walls he had his car searched before and "did not want his
stuff scattered all over the place." Walls assured Mantzke "that would not happen." Mantzke responded that Walls "could
take a glance inside the car" and that Mantzke would open the door for him. Walls also testified Mantzke told him he had
been in jail before for narcotics. 

 Walls testified that based on his conversation with Mantzke, he believed he had Mantzke's consent to search the car. He
searched the car "for safety reasons," confining his search to the areas of the inside within the driver's immediate reach. 
Under the passenger's seat, he discovered "a maroon zipper[ed] bag," which he unzipped and discovered "a content of [a]
white powder substance . . . [and] a small baggie with [a] hard white substance in it." Based on his training, he concluded
the bags contained methamphetamine. 

 Mantzke testified he never gave Walls permission to search his car. In fact, he testified he told Walls he could glance
through the windows of the car, but could not search it. He also denied telling Walls he would open the door for him. He
testified Walls called for a drug dog and made him wait twenty minutes for the dog to arrive. Mantzke testified it was only
after another officer arrived that Walls searched his car. 

 At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses and the
weight of their testimony. Green v. State, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996). Therefore, an appellate court must
view the evidence in the record and draw all reasonable inferences therefrom in the light most favorable to the trial court's
ruling. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Further, the appellate court must sustain the trial
court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. Id.;
Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

 The general rule is that we must afford almost total deference to the trial court's determination of the historical facts the
record supports, especially when the trial court's fact-findings are based on an evaluation of credibility and demeanor. 
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We are also to afford such deference to a trial court's ruling
on the application of law to fact questions if the resolution of those ultimate questions turns on an evaluation of credibility
and demeanor. Id. We may review de novo the application of law to fact questions not turning on credibility and
demeanor. Id.

 The parties dispute whether the search of Mantzke's car was based on his consent. Under the Fourth and Fourteenth
Amendments to the United States Constitution, a search conducted without a warrant issued with probable cause is per se
unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent to search is one of the well-established
exceptions to the constitutional requirements of both a warrant and probable cause. Id.; Carmouche v. State, 10 S.W.3d
323, 331 (Tex. Crim. App. 2000).

 When a person voluntarily consents to a search, the officer's authority to perform the search is not without limit. Florida v.
Jimeno, 500 U.S. 248, 251 (1991); DuBose v. State, 915 S.W.2d 493, 496 (Tex. Crim. App. 1996). The extent of the
search is limited to the scope of the consent given, and the scope of the consent is generally defined by its expressed object. 
Jimeno, 500 U.S. at 251;DuBose, 915 S.W.2d at 496. The standard for measuring the scope of consent is that of objective
reasonableness, i.e., what a reasonable person would have understood by the exchange between the officer and the
individual. Jimeno, 500 U.S. at 251; DuBose, 915 S.W.2d at 496.

 Relying on the semantic difference between the terms "glance" and "search," Mantzke contends he did not consent to a
search of his car. However, viewing the evidence in the light most favorable to the trial court's ruling, it is clear a
reasonable person in Walls's position would have understood Mantzke as consenting to a search limited to a brief look into
the interior of his car. Walls and Mantzke both testified Mantzke feared a more intrusive search would disturb his
belongings. Walls testified Mantzke offered to open the door for him, suggesting he was not limiting the search to what
Walls could observe through the car windows.

 The need for the protection of police officers should not be taken lightly; the right of the Fourth Amendment protection
against unreasonable searches and seizures of all citizens should also not be taken lightly. The officer in the present case
testified he was searching for weapons at the time he found the maroon bag containing illegal drugs. Such a search for
weapons will be justified only where the officer can point to specific and articulable facts which reasonably led him to
conclude the suspect might possess a weapon. Carmouche, 10 S.W.3d at 329. It should be further observed that such a
search is authorized even where the motorist is outside the vehicle and under an armed guard. Any search, however, must
be limited to those areas in which a weapon may be hidden. Michigan v. Long, 463 U.S. 1032, 1051-52 (1983). 

 The present case has an accumulation of factors that may have led to the search for a weapon. Mantzke could not produce
his driver's license or any form of identification; he had a torch-type lighter, which, according to the officer, was the type of
lighter commonly used for heating certain narcotics; and Mantzke was nervous and shaking and hesitant to tell the officer
anything. Further, Mantzke had stopped the car on the basis of "erratic driving," and Mantzke had told the police officer he
had been in jail before for narcotics.

 When the officer patted down Mantzke, he observed a large bulge in his pocket. Mantzke told him the bulge was money,
and when Mantzke pulled it out of his pocket at the request of the officer, there was$115. This story was inconsistent with
Mantzke's statement to the officer that his billfold, his driver's license, and all of his money had been stolen at a
convenience store down the road. 

 In Balentine, the Texas Court of Criminal Appeals held that the appellant's false and contradictory answers, although not
automatically synonymous with dangerousness, may be a reasonable basis for an officer to infer that this might be the type
of person who would conceal a weapon. Balentine v. State, 71 S.W.3d 763 (Tex. Crim. App. 2002).

 The officer testified that he searched for a weapon in places that would be within the immediate reach of the driver and
that under the passenger's seat, he located a maroon zippered bag. The bag was described as a large bag with a quantity of a
white powdered substance, along with a small bag with a harder rock-type substance, a large quantity of money
(approximately $2,500 in United States currency), two flashlights, a small vial of blue and white pills, a blue torch-type
lighter, and a West Virginia spoon, along with numerous Q-tips.

 We have concluded the officer's search did not exceed the scope of that which was necessary to determine whether
Mantzke was armed. Therefore, the search was valid, and the trial court properly denied Mantzke's Motion to Suppress the
fruits of the search.

 The judgment of the trial court is affirmed.







 Ben Z. Grant

 Justice



Date Submitted: May 16, 2002

Date Decided: November 1, 2002



Publish

1. In its brief and at oral argument, the State characterized Walls as testifying that Mantzke's vehicle almost hit his. That
was not the testimony. Walls testified Mantzke's car returned to the roadway "before he got pretty close to me." 



ity and decorum of the courtroom proceedings. 
Finally, absent any evidence the jury actually saw the shackles, we conclude, beyond a reasonable
doubt, that Ziolkowski did not suffer harm. See Canales, 98 S.W.3d at 697-98; Cooks, 844 S.W.2d
at 723; Long, 823 S.W.2d at 283.

 We overrule Ziolkowski's first point of error. (5)

 In separate points of error, Ziolkowski claims the evidence is legally and factually insufficient
to support the jury's verdict. 

Legal Sufficiency


 In our review of the legal sufficiency of the evidence, we employ the standards set forth in
Jackson v. Virginia, 443 U.S. 307, 319 (1979). This calls on the reviewing court to view the relevant
evidence in the light most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable doubt. Johnson v. State,
23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In our review, we must evaluate all the evidence in the
record, both direct and circumstantial, whether admissible or inadmissible. Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

Factual Sufficiency 

 In a factual sufficiency review, we view all the evidence in a neutral light and determine
whether the evidence supporting the verdict is so weak that the fact-finder's verdict is clearly wrong
and manifestly unjust or whether the great weight and preponderance of the evidence is contrary to
the verdict. Watson v. State, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); see also Johnson,
23 S.W.3d at 7; Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). It is the fact-finder's
role to judge the credibility of the witnesses and the weight to be given their testimony, and the
fact-finder "may resolve or reconcile conflicts in the testimony, accepting or rejecting such portions
thereof as it sees fit." Banks v. State, 510 S.W.2d 592 (Tex. Crim. App. 1974); see also Scott v.
State, 814 S.W.2d 517, 518-19 (Tex. App.--Houston [14th Dist.] 1991, pet. ref'd). When evidence
both supports and conflicts with the verdict, we must assume that the fact-finder resolved the conflict
in favor of the verdict. Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993); see also Marshall
v. State, 2006 Tex. Crim. App. LEXIS 2444, at *15 (Tex. Crim. App. Dec. 20, 2006) ("our
factual-sufficiency jurisprudence still requires an appellate court to afford 'due deference' to the jury's
determinations"). The appellate court's role is not to "find" facts; rather, it is to determine whether
the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and
unjust. Ballard v. State, 161 S.W.3d 269, 277 (Tex. App.--Texarkana 2005), aff'd, 193 S.W.3d 916
(Tex. Crim. App. 2006) (Cochran, J., concurring) ("trial court, acting as finder of fact in the face of
conflicting evidence, was authorized to believe or disbelieve any portion of the evidence").

The Evidence

 James "Bucky" Ball was shot, apparently while tied in a chair with an electrical cord, in the
house he shared with appellant, Cory Ziolkowski. Ball had been living with Ziolkowski for
approximately two months before Sunday, November 3, 2003. On that date, Ball, Ziolkowski, Craig
Rains, and Kim Houff were at the Ziolkowski house. Early in the afternoon, Rains borrowed
Ziolkowski's car, and he and Houff went on an errand. Before they left, Ziolkowski said to Rains,
who had known Ball since childhood, "I'm going to take care of Bucky, you want to help?" Rains
testified he thought Ziolkowski meant he was going to tell Ball that he had to move out of the house. 
While Rains and Houff ran their errand, Rains received a telephone call from Ziolkowski, who said,
"[I]t was done." At that point, Rains understood what Ziolkowski meant when he said he was going
to "take care of" Ball. While on the errand with Rains, Houff received a call from Ball asking her
to bring him some cigarettes and a Coke. After Rains received the call from Ziolkowski stating, "[I]t
was done," he told Houff that Ball would not need the cigarettes and Coke. Houff also testified she
had been told Ball was "fixing to be killed." When Rains and Houff returned to the house, Rains
gave Ziolkowski his car keys. Ziolkowski then said to Rains, "[N]ow who lacks the courage of their
convictions?" Rains said this was in reference to something Ball had said to Ziolkowski before,
when Ziolkowski would "talk about being this hit man or . . . trying to be a little bad ass." Rains and
Houff got on Rains' motorcycle and left. 

 Ziolkowski's neighbor Greg Oliver testified that, on the day of the shooting, he saw
Ziolkowski, who showed him two pistols, one chrome with a black handle and the other solid black,
and asked Oliver if he wanted to buy them. Oliver declined. Later that day, Oliver heard five shots
while he was standing outside. He saw two white men run out of the front door of Ziolkowski's
house. One got in the driver's side of a white pickup; the other went to look around the corner of the
house, then got in the passenger's side, and they sped off. Ziolkowski then came running out and
looked "puzzled." Ziolkowski asked Oliver what was going on, and if Oliver had shot off fireworks. 
Ziolkowski did not have a shirt on, and had a slight mark on his chest. According to Oliver,
Ziolkowski stuck his hands out to show Oliver, and said "nothing happened, nothing; I didn't do
anything." Ziolkowski then went to his porch and sat, playing the guitar.

 Ziolkowski testified he was in a workshop in the back yard working on a motorcycle when
he heard shots. Ziolkowski said he went around the house, saw Oliver, and started talking with him
about the shots. Then Ziolkowski saw Robert and Brian Rhea come out of Ziolkowski's house and
leave. According to Ziolkowski, he went in the house and found Ball, dead in a chair. The first
thing he thought of was getting rid of the body. Later that day, Sergeant David Biggars arrived at
Ziolkowski's house to investigate reports of shots being fired and of a white man without a shirt
waving a pistol around or having a gun tucked in his waistband. Biggars knocked three times before
Ziolkowski answered the door. When Biggars asked about the mark on Ziolkowski's chest, he said
his pet wolf had scratched him. Biggars testified that explanation did not seem consistent with the
nature of the wound, and Ziolkowski seemed nervous or fidgety. Ziolkowski gave the officers
permission to look around the house. The officers thought the house was very messy (one officer
described it as "nasty . . . what we would refer to . . . as a crack house or a drug house"), and thought
it odd that one bedroom was very clean, comparatively. The officers also smelled bleach. While one
officer stayed with Ziolkowski on the front porch, Biggars went to the back yard, where he saw a
black car backed up to the back door and where he found Ball's body, wrapped in a tent, with a chair
laying over it. When Biggars asked, "[I]s he dead?" Ziolkowski said, "I didn't do it." 

 Ziolkowski's sister and brother-in-law owned a home in Texarkana, Arkansas, and had
recently moved to El Dorado, Arkansas. Ziolkowski was asked by his sister if he would take care
of their animals at their house in Texarkana, Arkansas, and was given a key to the house. In the
course of the investigation, Ziolkowski directed officers to that house. In a baby's cradle at the
house, police found two pistols in a shaving kit bag. Ziolkowski's brother-in-law, Chris Cameron,
identified one of those guns, a Colt .45, as his. That gun was used to shoot Ball. Detective Chris
Lee testified Robert Rhea, in a statement, admitted pulling the trigger and killing Ball. (6) Lee also said
Rhea's whereabouts was unknown. 

 Robert Rhea's brother, Brian, testified he was with Robert at Ziolkowski's house on the day
of the killing. Ziolkowski and Robert were talking, but Brian said he could not hear the
conversation. He heard shots while he was in the back yard. Robert and Ziolkowski then came
around the house; Robert got in the truck, and the two Rheas went to Brian's house. Brian testified
he was pretty convinced Robert had just killed Ball, and the two brothers had a fight over whether
Robert should leave Brian's house. Brian said he did not know where Robert was and had not been
in contact with him for about eight months.

 Based on the above evidence, we find that a rational jury could have found that Ziolkowski,
acting with intent to promote or assist the offense, solicited, encouraged, directed, aided, or
attempted to aid another person in committing the offense of murder. (7) Salient facts for the jury to
consider included: 

 1. The murder weapon was owned by Ziolkowski's brother-in-law, and only Ziolkowski
had a key to the home where it was located.

 2. Ziolkowski had two pistols in his possession on the day of the murder. 

 3. Ziolkowski directed the police to the location of the murder weapon. 

 4. Ziolkowski told Rains he was going to "take care of Bucky" and asked Rains if he
wanted to help.

 5. Ziolkowski told Rains afterward that "[I]t was done" and he showed that he had the
"courage of his convictions."

 6. Ziolkowski's home was cleaned only at the murder site.

 7. Police were never called to the scene by Ziolkowski, but appeared in response to
another report of shooting at the home. 

 8. At the time of police intervention, they discovered Ball's body that Ziolkowski was
attempting to conceal and dispose of. 

 From these facts, a rational jury could conclude that Ziolkowski was guilty of the offense of
murder as a party to the offense. 

 In conducting a factual sufficiency review, we review the evidence in a neutral light. 
Ziolkowski presented evidence that Ball had stolen his brother-in-law's pistol from the home while
they both were at the home. He also testified he was outside of the home when the shooting
occurred. The evidence further shows that at least one other individual participated in this offense. 
However, even when viewed in a neutral light, we cannot say the evidence presented to the jury is
so weak that the verdict is clearly wrong and manifestly unjust; nor is the great weight and
preponderance of the evidence contrary to the verdict. Therefore, we find the evidence to be
factually sufficient. We overrule Ziolkowski's second and third points of error. 

Ziolkowski's Statements and the Rule of Optional Completeness

 At trial, the State sought to introduce statements made by Ziolkowski to police in the hours
after his arrest. Ziolkowski made three separate written statements to the police. The State offered
a portion of the second statement in which Ziolkowski acknowledged his possession of two pistols,
including the murder weapon, on the day of the murder, which he showed to his neighbor. The State
also offered a portion of the third statement in which Ziolkowski stated the gun used to shoot Ball
belonged to his brother-in-law and was a chrome and black Colt .45, and acknowledged hiding the
pistol in his brother-in-law's vacant house. As a result of this statement, the police retrieved the
murder weapon from his sister and brother-in-law's home. Ziolkowski sought to introduce the first
and second statements in their entirety and the omitted sentence in the third statement under the
provisions of evidentiary Rules 106 and 107. See Tex. R. Evid. 106, 107. The trial court denied
these requests. On appeal, Ziolkowski claims error in the trial court's ruling. 

 Even though the State did not offer any of the first statement, Ziolkowski sought to introduce
the entirety of the first statement given at 11:55 p.m. on November 2, 2003. In this statement,
Ziolkowski discussed that Ball had lived with him for three and a half months and that he and Ball
kicked Ball's girlfriend out of the house that morning. Further, it is stated that Ziolkowski was
outside working on a motorcycle when he heard shots; he saw Rhea run out of the house, and Rhea
threatened Ziolkowski and his girlfriend if Ziolkowski reported the killing to the police; Ziolkowski
then decided the best thing to do was to get Ball's body out of the house and described the steps he
set about to do the same, and then the police arrived. 

 In the second statement, given at 2:15 a.m. on November 3, the State offered only the first
paragraph describing how Ziolkowski was outside with two pistols, which Ziolkowski said his
neighbor Greg Oliver wanted to buy. In the rest of this second statement, Ziolkowski says he
panicked when he came in the house and saw that Ball had been shot, and Ziolkowski describes
actions he took to move the body. 

 The third statement which was introduced by the State, except for the one sentence (all three
statements were given to different police officers), discusses an injury to Ball's neck and how
Ziolkowski put the guns in a shaving bag, then took the bag to his brother-in-law's house and put the
bag, with the pistols, in a baby cradle. The trial court ordered redacted the following sentence in the
third statement, "I was not in the house when Bubba [Rhea] shot Bucky [Ball] and did not tell him
to shoot him." 

 The standard of review for a trial court's ruling under the Texas Rules of Evidence is abuse
of discretion. Angleton v. State, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). If the ruling was
correct on any theory of law applicable to the case, in light of what was before the trial court at the
time the ruling was made, then we must uphold the judgment. State v. Ross, 32 S.W.3d 853, 856
(Tex. Crim. App. 2000); Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). 

 Rule 106 of the Texas Rules of Evidence, "Remainder of or Related Writings or Recorded
Statements," allows an adverse party to introduce any other part of a writing or recorded statement
"which ought in fairness to be considered contemporaneously with it." Tex. R. Evid. 106. (8) Rule
107 of the Texas Rules of Evidence, "Rule of Optional Completeness" states: 

 When part of an act, declaration, conversation, writing or recorded statement is given
in evidence by one party, the whole on the same subject may be inquired into by the
other, and any other act, declaration, writing or recorded statement which is necessary
to make it fully understood or to explain the same may also be given in evidence, as
when a letter is read, all letters on the same subject between the same parties may be
given.


Tex. R. Evid. 107.

 Ziolkowski asserts on appeal that, by failing to allow the complete text of all three statements
to be admitted into evidence, the jury was at risk of hearing an incomplete version of events
surrounding the shooting of Ball. The portions offered by the State showed Ziolkowski in possession
of two pistols, including the murder weapon, on the day Ball was killed. The trial court found the
statements to be three separate statements which were not on the same subject as the portions of the
statements introduced by the State. 

 Rule 107 allows introduction of any statement or writing "on the same subject" as the
introduced evidence "necessary to make it fully understood . . . . " Tex. R. Evid. 107. 

 The Texas Court of Criminal Appeals has explained that the purpose of this provision is to
reduce the possibility of the fact-finder receiving a false impression from hearing the evidence of
only a part of the conversation, writing, act, or declaration. The theory behind the rule is that, by
allowing the jury to hear the rest of the conversation on the same subject, the whole picture will be
filled out, removing any misleading effect which may have occurred from the introduction of only
a portion of the conversation. Obviously, this purpose is achieved by receipt of the balance of the
conversation on the same subject. But to permit under this rule the introduction of other portions
of such a conversation wholly unrelated to the matter initially presented cannot contribute to
achievement of the purpose of the rule. Consequently, it is improper to rely on this rule as authority
for the introduction of such unrelated portions. Roman v. State, 503 S.W.2d 252, 253 (Tex. Crim.
App. 1974). "The plain language of Rule 107 indicates that in order to be admitted under the rule,
the omitted portion of the statement must be 'on the same subject' and must be 'necessary to make
it fully understood.'" Sauceda v. State, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004); (9) see also
Roman, 503 S.W.2d at 254 (disapproving language in earlier cases which interpreted former Texas
Code of Criminal Procedure Article 38.34, predecessor to the current rule 107, that, when one party
introduces any part of a statement, the other party is entitled to introduce the entire statement as
"overly broad." Such a reading "is not supported by the language of the statute and should not be
relied upon in the future."). Sauceda, 129 S.W.3d at 123; Roman, 503 S.W.2d at 254.

 The portions of the statements introduced by the State all related to the subject of
Ziolkowski's possession of the murder weapon both before and after the homicide occurred. 
Statements Ziolkowski offered were his versions of events of the day of the homicide giving his self-serving statements that Rhea acted alone in killing Ball and that Ziolkowski had no idea about the
crime or of Rhea's intents. "[S]elf-serving declarations of the accused are ordinarily inadmissible
in his behalf, unless they come under some exception, such as: being part of the res gestae of the
offense or arrest, or part of the statement or conversation previously proved by the State, or being
necessary to explain or contradict acts or declarations first offered by the State." Singletary v. State,
509 S.W.2d 572, 576 (Tex. Crim. App. 1974). 

 Here, there is no contention that Ziolkowski's statements were part of the res gestae of the
offense: they were made several hours after his arrest. See Spruill v. State, 624 S.W.2d 779, 782
(Tex. App.--Fort Worth 1981, no pet.) (self-serving statement which the defendant tried to adduce
at trial was not res gestae, but rather was made a considerable length of time after the shooting when
things had calmed down and after defendant had ample time to consider and calmly reflect on what
had happened). 

 Nor were they needed to explain or contradict the portions offered by the State, that
Ziolkowski was in possession of the murder weapon on the day of the killing and that he hid it and
another pistol after the killing. "Rule 107 is designed to guard against the possibility of confusion,
distortion, or false impression that could be created when only a portion of evidence is introduced." 
Crosby v. Minyard Food Stores, Inc., 122 S.W.3d 899, 903 (Tex. App.--Dallas 2003, no pet.)
(citations omitted). "The so-called rule of optional completeness takes effect when other evidence
has already been introduced but is incomplete and misleading." Jones v. State, 963 S.W.2d 177, 182
(Tex. App.--Fort Worth 1998, pet. ref'd). Here, there was no showing that the entirety of the three
statements were either on the same subject or necessary to correct a false or incorrect impression of
the evidence. 

 The trial court did not err in exercising its ruling that Ziolkowski was not entitled to introduce
the remainder of the written statements. We find no error and overrule Ziolkowski's fourth point of
error. 

 We affirm the judgment of the trial court. 


 Jack Carter

 Justice


Date Submitted: March 7, 2007

Date Decided: April 3, 2007


Publish
1. There is a brief mention in the record of this topic, and apparently the trial court's decision,
being made before voir dire, in chambers. 
2. See also Brown v. State, 877 S.W.2d 869, 871 (Tex. App.--San Antonio 1994, no pet.)
(generalized concerns about nature of defendant's prior sentences insufficient to support restraint).
3. On July 1, 1992, a gunman opened fire in the courtroom of the Fort Worth Court of Appeals,
killing one prosecutor and another attorney, and wounding at least two others, including a former
law clerk to this Court. See Davis v. State, 890 S.W.2d 489, 491 n.1 (Tex. App.--Eastland 1994,
no pet.) ("On July 1, 1992, George Lott shot and killed two people and wounded three others in the
courtroom of the Fort Worth Court of Appeals.").


An article in the USA Today newspaper details a shooting in an Atlanta, Georgia, courtroom killing
four persons, including the judge, and chronicles other courtroom tragedies. Larry Copeland, I Could
Tell He Was Going to Shoot Everybody," USA Today, March 13, 2005 (internet at
http://www.usatoday.com/news/nation/2005-03-13-ga-courthouse_x.htm).


A study by the Utah Bar found that, "Although it seems hard to believe, the courtroom is one of the
most dangerous places for lawyers." Stephen Kelson, An Increasingly Violent Profession, 14 Utah
Bar J. 8 (Mar. 2001).
4. See Deck v. Missouri, 544 U.S. 622, 632 (2005): "We do not underestimate the need to
restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude
in making individualized security determinations. We are mindful of the tragedy that can result if
judges are not able to protect themselves and their courtrooms. But given their prejudicial effect,
due process does not permit the use of visible restraints if the trial court has not taken account of the
circumstances of the particular case."
5. We note that any time a trial court authorizes shackles, there is a risk the jury might observe
them during the trial. If there is any evidence jurors actually observed the shackles, it would be
difficult, if not impossible, to find the error harmless. Of course, it is not error in those "rare" cases
when good and valid reasons justify shackling and the trial court states the reasons on the record.
6. The record is not clear on how or whether Rhea was in custody, and if so, how he had
disappeared. 
7. The jury charge included an instruction on the law of parties. 
8. Rule 106 has been described as merely a rule of timing applying only to writings and
recorded statements. When one party has presented a part of a statement, the other party may, at that
time, introduce another part which ought in fairness to be considered contemporaneously. "Rule 106
is an acceleration provision that applies to a subset of the evidence that is accorded admissibility
under the broader 'door-opening' doctrine codified in Rule 107." 1 Steven Goode et al., Texas
Practice: Guide to the Texas Rules of Evidence § 106.1 (2002). The issue here is the
admissibility of Ziolkowski's offer, not the timing of its introduction. Therefore, we will examine
Rule 107 to determine the admissibility of Ziolkowski's offer. 
9. In Sauceda, the defendant sought to offer a Child Protective Services caseworker's testimony
to impeach the child complainant, who had said the defendant threatened her with weapons. The
defendant proffered evidence that the caseworker would testify that the child had made no mention
of weapons in the interview. The State then said it would be entitled to offer the entire videotaped
interview, which contained extraneous offenses. The trial court agreed. The defendant then chose
not to call the caseworker. The Texas Court of Criminal Appeals held it was error to rule the State
could have introduced the entire videotape; the defendant could have called the caseworker to testify
that the child had not mentioned weapons without the necessity of playing the full videotape. 
Sauceda, 129 S.W.3d at 118-19.