John Lezell BALENTINE, Appellant,

v.

The STATE of Texas.

No. 73490.

Court of Criminal Appeals of Texas.

April 3, 2002.

C.J. McElroy, Amarillo, for Appellant.

John L. Owen, Assistant District Attorney, Amarillo, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

MEYERS, J., delivered the unanimous opinion of the Court.

Appellant was convicted of capital murder on April 19, 1999. Tex. Pen.Code Ann. § 19.03(a)(7)(A) (Vernon 1994). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises four points of error but does not challenge the sufficiency of the evidence at either stage of the trial. We will affirm.

### I.

■ In his first point of error, appellant asserts the trial court abused its discretion in denying his motion to suppress evidence obtained as the result of a detention and search that violated his rights under the Fourth Amendment.[2] Appellant also argues that the investigative detention evolved into an arrest that was not supported by probable cause. In order to address these contentions, we review the evidence introduced at the hearing on ap-

---

1. Unless otherwise indicated, all future references to Articles refer to Code of Criminal Procedure.

2. Appellant also claims that the trial court's denial of his motion to suppress violated his rights under Article I, Section 9 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure. Because appellant does not provide separate authority or argument for his state constitutional claims, we decline to address them. See Tex.R.App.P. 38.1; Heitman v. State, 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App.1991).

pellant's motion to suppress.[3]

Officer Timothy Hardin of the Amarillo Police Department testified that he was dispatched on a shots-fired call at 2:26 a.m. on Wednesday, January 21, 1998. When Hardin arrived, the complainant stated that he thought he had heard .22 caliber shots to the east of his residence. Hardin looked around and found nothing in the complainant's backyard or the alleyway behind the house. Two other officers then arrived and offered to assist Hardin by searching the area in their vehicle. After the officers left, Hardin noticed a man, later identified as appellant, walking down the street two houses away from the complainant's residence.

Hardin testified that when he first saw appellant, appellant had his hands in his pockets, appeared to be nervous, and was constantly looking over his shoulder in Hardin's direction. In addition, appellant was walking away from Hardin at a brisk pace. Hardin ordered appellant to stop and raise his hands in the air. Hardin then approached appellant, and conducted a pat-down "Terry frisk"[4] because he "didn't know if [appellant] might be the person who had fired shots" and that he "wanted to make sure that there was no weapon on [appellant] while I was speaking to him." Hardin did not feel any weapons.[5]

Nevertheless, Hardin suspected that appellant may have been involved in the reported gunfire and he escorted appellant to the back seat of his patrol car for questioning. When Hardin asked appellant why he was in the area, appellant stated that he was walking from a Wal-

Mart, which was approximately five miles away, to his sister's house, which was located several miles across town. Appellant identified himself as "John Lezell Smith" and told Hardin that he was staying with his sister. Appellant initially stated that he did not know his social security number but later told Hardin five of the digits. He then stated that he had planned to visit a friend in the area and agreed to let Hardin ask this friend to identify appellant because appellant did not have a driver's license or an identification card.

Hardin drove appellant to his friend's residence. Appellant's friend identified him as "John" and stated that he lived a block away, which contradicted appellant's story that he was staying with his sister several miles across town. Appellant explained that his friend was unaware he had moved. When Hardin asked appellant to show him where he used to live, appellant gave Hardin an address that turned out to be an empty lot.

Hardin asked appellant if he had ever been arrested in Amarillo and appellant replied that he had not. Hardin contacted the police dispatcher to run a records check. According to the police dispatcher, "John Lezell Smith" had been arrested for traffic warrants. Hardin again became concerned for his safety because he felt that a subject who would lie to him during questioning might "commit some type of unsafe act or conceal a weapon."

Hardin placed appellant in handcuffs, had him exit the vehicle, and conducted a second, more thorough pat-down search.

---

3. Unless otherwise indicated, the facts relevant to this point of error are taken from the suppression hearing testimony of Officer Timothy Hardin of the Amarillo Police Department.

4. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

5. Hardin admitted that he deviated from his training by failing to pat down appellant's genital area during this initial search.

When he patted down the outside of appellant's front pants pocket, he felt what he thought was a small pocket knife. Hardin put his hand in appellant's pocket and felt that the object was actually a lighter. While Hardin was feeling the lighter, his hand touched an object that he immediately recognized as a bullet. He removed the object from the pocket and saw that it was a .32 caliber bullet. Appellant told Hardin that he had recently been on a hunting trip and forgotten the bullet in his pocket. Hardin again placed appellant in the patrol car and called a supervisor who told Hardin to complete a field interview card and then release appellant because possession of a bullet was not against the law.

Hardin returned the bullet to appellant and offered him a ride to his sister's house, which appellant accepted. The trip took five to ten minutes and Hardin dropped appellant off at the residence at 3:36 a.m. Hardin returned to the area where he had detained appellant to have another look around but found nothing. Later that day, officers for the Amarillo Police Department were called to the scene of a triple homicide that had occurred at a residence fifty yards from where Officer Hardin encountered appellant. The police identified appellant as a suspect the day the victims were discovered. Appellant was eventually arrested in July of 1998 in Houston. At a pre-trial suppression hearing, appellant moved to suppress the physical evidence obtained as a result of Officer Hardin's search. The trial court denied the motion and Hardin testified at trial about the bullet he found in appellant's pocket. In addition, the State introduced evidence that the three victims were killed by .32 caliber bullets and that three spent cartridge shells found at the scene of the murders were marked identically to the bullet found on appellant.

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App.1996). In this review we give "almost total deference to the trial court's determination of historical facts" and review the court's application of search and seizure law *de novo*. *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex.Crim.App.1997). Here, the trial court did not make explicit findings of historical facts, so we review the evidence in a light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supported in the record. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex.Crim.App.2000) (citations omitted).

### A. Lawfulness of initial detention

An officer may conduct a brief investigative detention, or *"Terry* stop," when he has a reasonable suspicion to believe that an individual is involved in criminal activity. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868; *Carmouche*, 10 S.W.3d at 329. The reasonableness of a temporary detention must be examined in terms of the totality of the circumstances and will be justified when the detaining officer has specific articulable facts, which, taken together with rational inferences from those facts, lead him to conclude that the person detained actually is, has been, or soon will be engaged in criminal activity. *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App. 1997).

Appellant argues that Officer Hardin had only a hunch, not reasonable suspicion, to detain him. In support of this contention, he asserts that the only thing Officer Hardin observed on the date in question was a man crossing the street who looked back over his shoulder, as most individuals in a residential area would do if they noticed a police car.[6] Additionally,

6. Although he couches his arguments in the language of "reasonable suspicion," appellant

appellant argues that the timing of the detention was suspect. Appellant notes that once dispatched to the scene, Hardin spent several minutes interviewing the complainant, searching the area around the complainant's residence and speaking to the two officers who arrived to assist him. Appellant argues that because a significant amount of time had elapsed since the placement of the shots-fired call, the fact that appellant was seen crossing the street nearby was no longer suspicious. In other words, appellant's activity could not have been an articulable fact on which to base reasonable suspicion because any connection to criminal activity was too tenuous to justify a stop.

However, the totality of the circumstances demonstrate that Officer Hardin had reasonable suspicion to detain appellant. *Woods*, 956 S.W.2d at 38. Shortly after arriving on the scene of a shots-fired call, Hardin observed appellant walking across the street nearby the complainant's residence. It was approximately 2:30 in the morning in what Hardin described as a residential, low-traffic area. Appellant appeared nervous and was walking briskly away from the reported direction of the gunfire while constantly looking back over his shoulder in Hardin's direction. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (nervous, evasive behavior is a pertinent factor in determining reasonable suspicion for a *Terry* stop). Officer Hardin was able to point to specific articulable facts that led him to conclude appellant was or would soon be engaged in criminal activity. Viewing the totality of the circumstances, we conclude Hardin had reasonable suspicion to detain appellant.

## B. Weapons Search

Appellant also challenges the validity of the second pat-down search performed by Hardin, during which Hardin discovered the .32 caliber bullet.

 Law enforcement personnel may conduct a limited search for weapons of a suspect's outer clothing, even in the absence of probable cause, where an officer reasonably believes that the suspect is armed and dangerous to the officer or others in the area. *Carmouche*, 10 S.W.3d at 329 (citations omitted); *Terry*, 392 U.S. at 27, 29. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence...." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Such a "weapons frisk" will be justified only where the officer can point to specific and articulable facts which reasonably led him to conclude that the suspect might possess a weapon. *Carmouche*, 10 S.W.3d at 329. The officer need not be absolutely certain that an individual is armed; the issue is whether a reasonably prudent person would justifiably believe that he or others were in danger. *O'Hara v. State*, 27 S.W.3d 548, 551 (Tex.Crim.App.2000) (citing *Terry*, 392 U.S. at 27, 88 S.Ct. 1868). The timing of a protective search is not dispositive in evaluating its reasonableness. *Id.* at 553–54.

 Here, appellant's behavior became increasingly suspicious after the first pat-down search. Appellant gave Hardin false and contradictory answers to his questions. Appellant could not tell Officer Hardin where he was staying, or offer a consistent explanation for why he was in

---

seems primarily to argue that his activities on the morning of the shots fired call were as consistent with innocent activity as with criminal activity and could not, therefore, form the

basis of reasonable suspicion. The "as consistent with innocent activity as with criminal activity" construct was explicitly overruled in *Woods*, 956 S.W.2d at 38.

the area. When asked where he was living, appellant led Officer Hardin to a vacant lot. Appellant lied about having never been arrested in Amarillo. Although lack of truthfulness is not automatically synonymous with dangerousness, we view the evidence in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 329. Viewed in this light, the evidence supports a ruling that it was reasonable for Officer Hardin to infer from appellant's inconsistent statements that appellant might be the type of person who would conceal a weapon. This is so even though Hardin had already conducted one pat-down search of appellant. In this case, appellant's behavior after the first search heightened Hardin's suspicions and led him to the reasonable belief that appellant might be presently armed and dangerous.

■■■■ Appellant argues further that by reaching into his pocket and recovering the bullet during the second pat-down search, Hardin exceeded the scope of his authority under *Terry*. It is true that the scope of a protective *"Terry* frisk" is a narrow one. When a protective search is warranted, the search must be carefully limited to that which is necessary to discover weapons that could reasonably harm the police officers or others. *Terry*, 392 U.S. at 25–26, 88 S.Ct. 1868.

In this case, when Hardin patted down the outside of appellant's front pants pocket, he felt what he thought was a weapon.

In order to ascertain whether the object was in fact a weapon, Hardin reached into appellant's pocket. That in the course of doing so Hardin discovered an object he immediately recognized by touch as a bullet does not render the search unreasonable. *See, e.g., Worthey v. State*, 805 S.W.2d 435, 439 (Tex.Crim.App.1991) (search of interior of appellant's purse reasonable where appellant appeared to be hiding purse from officers and merely touching purse's exterior not sufficient to determine whether appellant was carrying weapon). Hardin's search did not exceed the scope of that which was necessary to determine whether appellant was armed. Therefore, the search was valid and the trial court properly denied appellant's motion to suppress the fruits of the search.

### C. Unreasonable Detention

■■■■ Appellant next contends that the length of the detention was unreasonable.[7] Although the length of the detention may render a *Terry* stop unreasonable, there is no "bright line" time limit for *Terry* stops. *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The reasonableness of the detention instead depends on whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly. *Id.* An investigative detention must be temporary and the questioning must last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500,

---

**7.** Appellant alleges that Hardin detained him for sixty minutes. He bases this assertion on Hardin's testimony that he was dispatched on the shots fired call at 2:26 a.m. and that he released appellant at his sister's house at approximately 3:36 a.m. A closer look at Hardin's testimony, however, reveals that the actual detention did not last that long. Hardin testified that he was dispatched at 2:26 a.m., that he took a few minutes to drive to the scene, and that he encountered appellant approximately fifteen minutes after he arrived at the scene. Indeed, appellant relies on this lapse of time in support of his argument that Hardin did not have reasonable suspicion to detain him. Additional time elapsed when appellant agreed to accompany Hardin to his friend's residence in order to confirm his identity and accepted Hardin's offer to take him to his sister's house. Hardin testified that it took him five to ten minutes to drive appellant to his sister's house.

103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Davis v. State,* 947 S.W.2d 240, 245 (Tex. Crim.App.1997); *Mays v. State,* 726 S.W.2d 937, 944 (Tex.Crim.App.1986), *cert. denied,* 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1020 (1988).

 Hardin initially stopped appellant to learn his identity and to determine if he was involved in the gunfire. Officer Hardin's questioning lasted no longer than was necessary to effectuate this purpose. In this case, the amount of time necessary to question appellant about his possible involvement in the shots fired call increased substantially because of *appellant*'s evasive answers, and not because of some dilatory tactic on Officer Hardin's part. The length of the detention was, therefore, reasonable.

### D. Unlawful Arrest

 Appellant finally asserts that the initial investigative detention evolved into an unlawful arrest. Appellant argues that he was under arrest because a reasonable person would not have believed that he was free to leave after sitting in the back of a patrol car, being handcuffed and then frisked.

 As noted above, *Terry* provides that a police officer may stop and briefly detain a person reasonably suspected of criminal activity in the absence of probable cause to arrest the person. *Id.,* 392 U.S. at 22, 88 S.Ct. 1868. The officer may use such force as is reasonably necessary to effect the goal of the stop: investigation, maintenance of the status quo, or officer safety. *Rhodes v. State,* 945 S.W.2d 115, 117 (Tex.Crim.App.) (citing *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)), *cert. denied,* 522 U.S. 894, 118 S.Ct. 236, 139 L.Ed.2d 167 (1997). There is no bright-line test providing that mere handcuffing is always the equivalent of an arrest. *Id.*

at 118. Instead, when evaluating whether an investigative detention is unreasonable, "common sense and ordinary human experience must govern over rigid criteria." *Id.*

We conclude that the investigative detention in this case did not evolve into an arrest. To the extent appellant was restrained, the restraint did not exceed the scope of a *Terry* "stop and frisk." Hardin escorted appellant to his patrol car "to question him further about his being out" and "to investigate if he may have been involved in the shots being fired in the area in some way, shape, or form." He handcuffed appellant because he feared for his own safety. These safety concerns were reasonable, given the circumstances: it was early in the morning; Hardin had encountered appellant in an area where gunfire had been reported; appellant exhibited suspicious behavior and lied in response to Hardin's questions; and Hardin was alone in the patrol car with appellant without a bulletproof partition between the front and back seats. The investigative detention did not evolve into an arrest simply because appellant was escorted to the patrol car and handcuffed. Hardin did only that which was reasonably necessary to ensure his own safety while investigating appellant's possible involvement in the gunfire. *Rhodes,* 945 S.W.2d at 117.

We conclude that Hardin's investigative detention and pat-down search of appellant were reasonable and justified under the circumstances and did not constitute an unlawful arrest. The trial court did not abuse its discretion in denying appellant's motion to suppress evidence obtained as a result of the detention and search. **Appellant's first point of error is overruled.**

### II.

 Appellant contends in his second point of error that the trial court abused

its discretion in denying his motion to suppress evidence and testimony obtained as a result of the warrantless search of the residence where he was staying on January 22, 1998, in violation of the Fourth Amendment.[8] Appellant specifically argues that he had a legitimate expectation of privacy and that the owner of the residence lacked the authority to consent to the search.

Sergeant Paul Charles Horn, an investigator with the Special Crimes Unit in the Amarillo Police Department, was assigned to investigate the homicides. He testified at the suppression hearing that acquaintances of the victims identified "John Balentine" as a possible suspect. Investigators for the Unit also determined that "John Balentine" was the same individual as "John Lezell Smith," whom Officer Hardin encountered earlier that morning. They learned that Balentine had been staying in a building owned by Mr. Michael Means, located at 308 North Virginia Street in Amarillo.

When Lieutenant Edward William Smith arrived at 308 North Virginia Street the following day, Means told him that he was not renting the residence to appellant but that he had given him permission to stay there as a "guest" because "he felt sorry for him."[9] Means gave written consent to search the residence. The police then searched the residence and found a receipt for the purchase of .32 caliber ammunition from a local K–Mart store.

Appellant argues that Means lacked the authority to consent to the search of the residence.[10] Consent searches are an established exception to the warrant and probable cause requirements of the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Reasor v. State*, 12 S.W.3d 813, 817 (Tex.Crim. App.2000). A third party may properly consent to a search when he has control over and authority to use the premises being searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Kutzner v. State*, 994 S.W.2d 180, 186 (Tex.Crim.App.1999).

Here, the facts demonstrate that Means had control over and authority to use the premises searched. Means allowed appellant to stay on his property after appellant had been thrown out of the house. The

---

**8.** Appellant additionally argues that the trial court's denial of his motion to suppress violated his rights under Article I, Section 9 of the Texas Constitution and Article 38.23 of the Texas Code of Criminal Procedure. Again, since appellant makes no distinctions between federal and state law, we will not address his state constitutional claims separately. Tex. R.App.P. 38.1; *Heitman*, 815 S.W.2d at 690–91 n. 23.

**9.** Appellant had been living with his former girlfriend, Misty Caylor, who was the sister of one of the victims, Mark Caylor, in the residence in which the murders took place. That residence was also owned by Means and appellant came to know Means in the time he lived with Misty Caylor. Appellant contacted Means a few days before New Year's Day of 1998 and told Means that he had been thrown out of Misty Caylor's house.

**10.** Appellant also argues that he had a legitimate expectation of privacy in the residence because all of his belongings were there and because locks were maintained to exclude others from entry. In addition, he notes that the privacy rights of tenants have been recognized in the law, although he does not explicitly argue he was a tenant of Mr. Means. Whether appellant had a legitimate expectation of privacy that would have been invaded if the police had searched the premises *without* Means's consent, and whether appellant was a tenant as such are issues that are legally and conceptually separate from a determination of whether or not Means had authority to consent to the search. Thus, we limit our discussion to the issue of Means's authority to consent.

property consisted of two buildings, "A" and "B." Means allowed appellant to stay in "B," the rear house which had utilities but was used for storage purposes. Means told appellant that the rear house "wasn't worth renting" and that it was "just a place for him to seek haven until he found himself another place to live." In lieu of paying rent, appellant cleaned up the property for Means. The utilities were in Means' name and Means paid the utility bills while appellant was staying there. Both appellant and Means had keys to the lock on the front door. Appellant kept his personal belongings in the dwelling, but he did not move any furniture into the building. Means testified that, to the best of his knowledge, appellant never returned to the residence after the murders took place.

■ Appellant argues that even though Means had keys to the premises, Means could not have given valid consent to search because he never entered the homes of his tenants or guests when they were not home. In determining whether a third party may give consent to a search, however, our focus is not on a third party's *actual* use of the premises searched. Rather, we look to whether the third party had the *authority* to use the premises. *Garcia v. State*, 887 S.W.2d 846, 851–52 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).

In *Garcia*, the defendant's landlord was the owner of the garage in which the defendant had been living. He and his landlord agreed that the landlord could enter the garage whenever he chose to. Both men were to have a key to the premises. The defendant argued that his landlord did not have authority to consent to a search because he had not actually used his right to enter the garage. *Id.* at 851. We held:

Although [the landlord] may not have recently entered the garage to obtain property, the evidence is clear that he had an express oral agreement with appellant that he could continue to use the premises by storing his property inside. There was no evidence that this agreement was limited in scope or duration. Because of the uncontroverted testimony that both [the landlord] and appellant had equal access to the garage apartment, [the landlord] had authority to consent to the search.

*Id.* at 851–52 (footnote omitted). In the present case, Means testified that it was not his habit to enter into the dwellings of his tenants or guests when they were not home. However, there is no evidence in the record that Means refrained from entering the premises for any reason other than self-imposed forbearance.

The evidence demonstrates that Means had control over and authority to use the rear house and could give valid consent to the search. The trial court did not err in overruling appellant's motion to suppress the fruits of the warrantless search of Means's building. **Appellant's second point of error is overruled.**

### III.

■ In his third point of error, appellant contends that the trial court erred by failing to instruct the jury to disregard illegally obtained evidence in accordance with Article 38.23. A trial court is required to include an Article 38.23 instruction in the jury charge only if there is a factual dispute as to how the evidence was obtained. *Thomas v. State*, 723 S.W.2d 696, 707 (Tex.Crim.App.1986).

■ Appellant contends that a fact issue was raised concerning Means's authority to consent to the search of the rear house. The facts that supported the warrantless search of Means's rear building

were, however, not controverted. Although appellant now advances the *legal* argument that Means's authority to use and control the premises was not co-extensive with appellant's, the factual bases for Means's authority to consent to the search were uncontroverted at trial. No instruction was required.[11] *Id.* **Appellant's third point of error is overruled.**

## IV.

In his fourth point of error, appellant challenges the admissibility of the taped confession that he gave after being arrested in Houston on July 24, 1998.[12] Appellant argues that his arrest was illegal because the arrest warrant was based on a probable cause affidavit that, in turn, was based on a sworn complaint by Sergeant Horn that was "replete with evidence reference to illegally obtained items." Appellant specifically challenges the probable cause affidavit because it detailed Officer Hardin's stop and search of appellant and placed "great emphasis" on the fact that Hardin found a .32 caliber bullet in appellant's pocket.

Because his arrest was illegal, appellant argues, the taped confession should have been suppressed as unlawfully obtained pursuant to Article 38.23, the Texas statutory exclusionary rule. Article 38.23 provides:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or

laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case....

The crux of appellant's argument is that his arrest was illegal because he was illegally stopped and searched by Officer Hardin. For the reasons we upheld the validity of the detention and pat-down search in appellant's first point of error, we likewise find this argument to be without merit. **Appellant's fourth point of error is overruled.**

## V.

Finding no reversible error, we affirm the judgment of the trial court.

---

11. Appellant failed to request an Article 38.23 instruction and stated that he had "[n]o objections" to the proposed charge. Because we find that no error occurred, we need not decide whether appellant waived the asserted jury charge error. *Thomas,* 723 S.W.2d at 707.

12. Appellant additionally claims that the "sworn complaint by Sgt. Horn" and the ar-

rest warrant should have been suppressed under Article 38.23. Although these two items are relevant to the validity of appellant's arrest, they were not admitted into evidence at guilt-innocence or punishment. Accordingly, we limit our discussion to the admissibility of appellant's taped confession under Article 38.23.