

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-21-00424-CR

Joe Michael **ENRIQUEZ**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 451st Judicial District Court, Kendall County, Texas
Trial Court No. 7464
Honorable Kirsten Cohoon, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:        Rebeca C. Martinez, Chief Justice
                Liza A. Rodriguez, Justice
                Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: July 26, 2023

AFFIRMED

Joe Michael Enriquez was charged with possession with intent to deliver a controlled substance, methamphetamine, in an amount of four grams or more but less than 200 grams. *See* TEX. HEALTH & SAFETY CODE § 481.112(d). Enriquez filed a motion to suppress the methamphetamine seized by law enforcement officers during a traffic stop. Following an evidentiary hearing, the trial court denied the motion to suppress. Thereafter, Enriquez entered into

---

[1]Sitting by assignment pursuant to section 74.003(b) of the Texas Government Code

a plea-bargain agreement with the State and pled guilty to the charged offense, and the trial court accepted the plea and entered a judgment of conviction.[2]

In four issues, Enriquez argues the trial court abused its discretion in denying his motion to suppress. In his first two issues, Enriquez challenges the lawfulness of his detention. In his second two issues, Enriquez challenges the lawfulness of the pat-down search that occurred during his detention. We affirm.

## BACKGROUND

On July 23, 2019, Enriquez was a passenger in a car pulled over by a Texas Department of Public Safety ("DPS") trooper for operating with an expired license plate and displaying a wrong registration insignia.[3] Approximately eight minutes after the car was stopped and during a pat-down search, the trooper found methamphetamine in Enriquez's pocket and arrested him for the charged offense.

At the suppression hearing, the trial court considered the testimony of Steven Edward Mayfield ("Mayfield"), the DPS trooper who initiated the traffic stop and ultimately arrested Enriquez; the videos from the dash cam and the trooper's body cam; a photograph of a long-blade knife or dagger found on the passenger-side floorboard of the car; and the trooper's written offense report. The suppression hearing evidence showed that after the car's driver, Miguel Gonzalez Arispe, pulled into a gas station and stopped, Mayfield approached the driver's side window and started talking to him and Enriquez, who was sitting in the front passenger seat. Mayfield asked Arispe and Enriquez what type of work they did. One of them answered that they sheared sheep, and the other one answered that they sheared goats. Mayfield testified that he believed that Arispe

---

[2]The trial court certification states this is a plea bargain case, but Enriquez has the right to appeal because matters were raised by written motion filed and ruled on before trial.

[3]TEX. TRANSP. CODE §§ 502.407, 502.475.

and Enriquez's answers were suspicious because in his personal experience goats were not sheared[4] and because he noticed that neither Arispe nor Enriquez had sheep or goat hair on them. Mayfield noticed that both Arispe and Enriquez were shirtless and tattooed. Mayfield also observed that Arispe and Enriquez "talked over each other" and avoided eye contact with him, which he considered to be signs of nervousness. Mayfield asked Arispe and Enriquez for identification, and they provided him their licenses. Mayfield asked Arispe for proof of insurance, but Arispe had trouble locating it.

At this point, Mayfield asked Arispe to step out of the car and follow him to his DPS vehicle. Arispe complied while looking through some papers for his proof of insurance. Before reviewing Arispe's proof of insurance and running a computer check on him, Mayfield told Arispe that he would receive a warning for the traffic violations. According to Mayfield, Arispe's nervousness did not diminish, which Mayfield found to be unusual. It was Mayfield's experience that people usually relax when they are told they will receive a warning instead of a citation. Arispe's continued nervousness made Mayfield suspect that criminal activity could be taking place. Mayfield then asked Arispe if he had ever been arrested before. Initially, Arispe said that he had no prior arrests. But when Mayfield asked, "Never?", Arispe changed his answer, stating that he had been arrested before but only for "minor" things like "disorderly conduct."

Mayfield sat down in the cab of the DPS vehicle and scanned Arispe and Enriquez's licenses to check for outstanding warrants and review their criminal histories. While Mayfield was conducting the warrant and criminal history checks, Arispe found his proof of insurance and handed it to Mayfield, who reviewed the document and returned it to Arispe. After scanning the

---

[4]Enriquez disputes the accuracy of this statement, pointing out that Angora goats, which produce mohair, are sometimes sheared. Because the statement is not necessary to our determination of the existence of reasonable suspicion, we do not consider it.

licenses, Mayfield learned that Arispe and Enriquez did not have any outstanding warrants, but they both had criminal records. In fact, contrary to Arispe's representation that he had only been arrested for minor offenses, Arispe had several prior arrests for felony offenses. Enriquez had fourteen previous convictions, including convictions for drug possession, manufacture and delivery of a controlled substance, aggravated assault with a deadly weapon, and unlawful possession of weapons charges. Mayfield explained that this type of criminal history causes him to be more alert and cautious during a traffic stop because someone with a history of weapons and narcotics charges is more likely to have a weapon. At this point, two additional officers appeared on the scene.

Mayfield exited his DPS vehicle and conducted a pat-down search of Arispe. He asked Arispe if there was anything illegal in his car and Arispe said there was not. Thereafter, Mayfield asked Arispe for consent to search his car, but Arispe did not answer the question. According to Mayfield, the request for consent to search caused Arispe to become extremely nervous and he turned his head and looked back at his car. This increased Mayfield's suspicions of some criminal activity. In Mayfield's training and experience, it was common for people to look directly at contraband. Mayfield further observed that the request for consent to search caused Arispe to start "fumbling over his words." When Mayfield asked Arispe for consent to search his car a second time, Arispe continued talking but did not answer the question. Finally, when Mayfield asked Arispe for consent to search his car a third time, Arispe refused consent.

Based on these circumstances, Mayfield believed there might be something illegal going on between Arispe and Enriquez. Mayfield radioed for a K-9 unit, but none was on duty. Mayfield then decided to continue his investigation and speak with Enriquez, who was still sitting in the front passenger seat. Mayfield testified that he wanted to talk to Enriquez to further his

investigation, to confirm Enriquez's story, to see if Enriquez and Arispe had matching stories, or to see if Enriquez's story had changed.

Mayfield walked over to the front passenger-side door and knocked on it. Enriquez opened the car door. Mayfield then asked Enriquez to step out of the car, and Enriquez complied. Mayfield noticed that Enriquez was now wearing a shirt and he wondered if Enriquez had put on a shirt to cover his tattoos. When Enriquez exited the car, Mayfield saw, in plain view, a large knife in the car where Enriquez's feet had been. Concerned for his safety, Mayfield decided to conduct a pat-down search of Enriquez for weapons. As Mayfield started the pat-down search of Enriquez, one of the other officers saw multiple white pills inside the car and he asked Enriquez about them. Enriquez said the pills were Arispe's heartburn medication.

When Mayfield touched the outside of Enriquez's left front pocket, he felt an object in it and asked Enriquez to remove it. Enriquez complied and retrieved a pack of cigarettes and a lighter from his pocket and handed them to Mayfield. When Mayfield touched the outside of Enriquez's right front pant pocket, he felt a hard object in it and asked Enriquez to empty the pocket and pull the object out slowly. Enriquez put his hand in his pocket, but then claimed his hand was stuck and said there was nothing in that pocket. Indicating to Enriquez's right front pant pocket, Mayfield asked, "What's that hard thing right there?" Enriquez's demeanor changed at this point—he became uncooperative, cursed, turned, and started moving away from Mayfield. In response, Mayfield and another officer handcuffed Enriquez. Mayfield asked Enriquez if the object in his pocket was a gun and Enriquez said it was not. Mayfield then asked, "[Is it] weed?" To which Enriquez replied, "Yeah." Mayfield then removed the object, discovering that it was a plastic container holding twenty small plastic packets, each of which contained methamphetamine. Mayfield arrested Enriquez for possession of a controlled substance and placed him in the DPS

vehicle. After arresting Enriquez, Mayfield prepared and issued a warning to Arispe for the traffic violations.

The trial court denied the motion to suppress. The trial court made thirty-eight findings of fact, most of which are not challenged on appeal. The trial court also made the following relevant conclusions of law:

- Mayfield was reasonable in questioning Arispe and Enriquez during the stop and the investigation;

- Mayfield developed reasonable suspicion that Arispe and Enriquez were involved in criminal activity independent of the traffic stop;

- Mayfield did not prolong the traffic stop when he spoke to Arispe and Enriquez; and

- Mayfield acted reasonably when he patted down Enriquez due to his behavior and having a weapon in the car.[5]

Enriquez appealed.

## STANDARD OF REVIEW

We review the trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). In conducting our review, we give almost total deference to the trial court's determination of historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). However, we review de novo the trial court's application of the law to those facts. *Lerma*, 543 S.W.3d at 190.

When, as here, the trial court makes explicit findings of fact, we first determine if the evidence, viewed in the light most favorable to the trial court's ruling, supports the trial court's

---

[5]The trial court also concluded that Mayfield had probable cause to stop Arispe's car. However, the validity of the traffic stop is not challenged on appeal.

fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We then review the trial court's legal rulings de novo. *Id*. In conducting our review, we afford the prevailing party the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013). We must affirm the trial court's ruling if it is correct on any theory of law applicable to the case. *Lerma*, 543 S.W.3d at 190.

### DURATION OF THE TRAFFIC STOP

In his first issue, Enriquez argues that his detention violated the Fourth Amendment because it continued after the tasks associated with the traffic violations were completed or should have been completed.

When a vehicle is pulled over for investigation of a traffic violation, the driver and all passengers are "seized" for purposes of the Fourth Amendment. *See Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop." *Id*. "Normally, the stop ends when the police have no further need to control the scene and inform the driver and passengers they are free to leave." *Id*. "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id*.

During the course of a lawful traffic stop, an "officer may request certain information from a driver, such as the driver's license, vehicle registration, and proof of insurance, and run a computer check on that information." *Lerma*, 543 S.W.3d at 190. An officer may check for outstanding warrants and may ask about the purpose of the trip and the destination. *Kothe v. State*, 152 S.W.3d 54, 63-64 n.36 (Tex. Crim. App. 2004). An officer may perform a criminal history check as long as it does not unduly prolong the traffic stop. *Hamal v. State*, 390 S.W.3d 302, 307-

08 (Tex. Crim. App. 2012). "An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop." *Lerma*, 543 S.W.3d at 190.

Generally, an officer's authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *United States v. Rodriguez*, 575 U.S. 348, 354 (2015); *see Lerma*, 543 S.W.3d at 191 ("Once the computer check is completed, and the officer knows that the driver has a current valid license, no outstanding warrants, and the car is not stolen, the traffic stop investigation is fully resolved."). "A traffic stop made for the purpose of investigating a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop." *Lerma*, 543 S.W.3d at 190.

Enriquez's argument is premised on the idea that as soon as Mayfield reviewed Arispe's proof of insurance and returned the document to Arispe, all of the tasks associated with the traffic stop were completed. Enriquez argues that at this juncture Mayfield was required to issue the warnings for the traffic violations and permit Arispe and Enriquez to leave the scene. We disagree with this premise. The record conclusively establishes that when Mayfield returned the insurance document to Arispe, Mayfield had not completed all of the tasks associated with the traffic violations. First, Mayfield had not finished the criminal history checks. The body cam video shows that after handing the insurance document back to Arispe, Mayfield spent approximately a minute continuing to review the criminal history on the computer. Second, Mayfield had not returned Arispe and Enriquez's licenses to them. Finally, Mayfield had not prepared the written warning for the traffic violations and issued it to Arispe. Mayfield testified that DPS policy prohibited him from issuing a mere verbal warning and required him to create a written warning in the computer, print it, and have the driver sign it, and he did not issue a written warning to Arispe until after

Enriquez was arrested.[6] Under the facts and circumstances presented, we conclude that "the tasks tied to the traffic infraction" were not, nor reasonably should have been, completed when Mayfield returned the proof of insurance to Arispe. *See Rodriguez*, 575 U.S. at 354.

Furthermore, the overall duration of the traffic stop was not unduly prolonged in this case. In *Lerma*, a case in which a passenger similarly challenged the duration of his detention during a traffic stop, the Texas Court of Criminal Appeals held that a nine-minute lapse from the time the officer initiated the stop to the time the passenger was arrested was not an unreasonable amount of time to investigate the situation. *Lerma*, 543 S.W.3d at 195. Here, only about eight minutes elapsed from the time Mayfield first approached the driver's side window to begin his investigation of the traffic violations to the time he found the methamphetamine in Enriquez's pocket and placed him under arrest. During much of this time, Mayfield was actively involved in tasks related to investigating the traffic violations, including gathering licenses from Arispe and Enriquez, waiting for Arispe to locate his proof of insurance, checking for outstanding warrants, and reviewing Arispe and Enriquez's criminal histories. *See id.* at 191 (concluding the officer did not unlawfully prolong the traffic stop by questioning the passenger because he "was still actively involved in the traffic stop when he questioned [the passenger] and he had not yet completed all aspects of the traffic stop," including running a computer warrant check on the driver).

Affording the State the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence, we conclude that all of the tasks associated with the traffic stop were not completed, nor reasonably should have been completed, when Mayfield

---

[6]In support of his argument, Enriquez directs our attention to a portion of Mayfield's testimony elicited on cross-examination in which he agrees that he had completed all the tasks completed with the traffic stop "as of 4:11 on the body cam." However, the body cam video shows that at 4:11 Mayfield was still reviewing Enriquez's proof of insurance. At 4:20 Mayfield handed the insurance document back to Arispe and he turned his attention back to reviewing Arispe and Enriquez's criminal histories on the computer until 5:19. Additionally, on direct examination, Mayfield testified that the traffic stop did not end until he issued the written warning to Arispe.

returned the proof of insurance document to Arispe. Rather, all of the tasks associated with the traffic stop were not completed until Mayfield prepared the written warning for the traffic violations and issued it to Arispe. Based on this record, we conclude the officer did not unreasonably extend the duration of the traffic stop. Enriquez's first issue is overruled.

### REASONABLE SUSPICION OF OTHER CRIMINAL ACTIVITY

In his second issue, Enriquez argues that his continued detention, beyond the time the tasks associated with the traffic stop were completed, violated the Fourth Amendment because Mayfield lacked reasonable suspicion that Enriquez was involved in criminal activity based on specific, articulable facts. Like his first issue, Enriquez's second issue is premised on the idea that as soon as Mayfield reviewed Arispe's proof of insurance and returned the document to Arispe, all of the tasks associated with the traffic stop were completed. However, as we stated in our discussion of the first issue, all of the tasks associated with the traffic stop were not completed until Mayfield prepared the written warning for the traffic violations and issued it to Arispe. But even if all of the tasks associated with the traffic stop had been completed, Enriquez's continued detention was lawful because Mayfield had reasonable suspicion of criminal activity independent of the traffic violations.

"A seizure justified *only* by a traffic violation becomes unlawful if prolonged beyond the time reasonably required to conduct the traffic stop." *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017) (emphasis added). Nevertheless, "if an officer develops reasonable suspicion that the driver or an occupant of the vehicle is involved in criminal activity the officer may continue questioning the individual regardless of whether the official tasks of a traffic stop have come to an end." *Lerma*, 543 S.W.3d at 191. Therefore, "continuing a brief investigatory detention beyond the time necessary to conduct a traffic stop requires reasonable suspicion of criminal activity apart from the traffic violation." *Ramirez-Tamayo*, 537 S.W.3d at 36. If a valid

traffic stop evolves into an investigative detention for a drug-related offense, the temporary detention may continue for a reasonable time to dispel the reasonable suspicion that a vehicle contains drugs. *Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014).

"Reasonable suspicion exists when an officer is aware of specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a person has engaged, is engaging, or soon will be engaging in criminal activity." *Hamal*, 390 S.W.3d at 306. "The reasonable suspicion standard is wholly objective; the subjective intent of the officer conducting the investigation is irrelevant." *Id*. "The standard requires only some minimal level of justification for the [investigation]." *Id*. Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion "looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011).

### *Challenged Fact Findings*

As a preliminary matter, we must consider Enriquez's challenges to the trial court's findings of fact. Enriquez argues that the following fact findings are unsupported by the evidence: (1) that Arispe and Enriquez were nervous at the inception of the stop, (2) that Arispe still appeared nervous after learning he would be given a warning, and (3) that Mayfield found Arispe's nervous demeanor to be consistent with someone being deceptive.

Under our standard of review, we first determine if the evidence, viewed in the light most favorable to the trial court's ruling, supports the trial court's fact findings. *Kelly*, 204 S.W.3d at 818. "When there are factual disputes regarding testimony or the contents of a videotape, the trial court's findings of historical fact are afforded almost total deference." *Miller v. State*, 393 S.W.3d

255, 263 (Tex. Crim. App. 2012). However, "when evidence is conclusive . . . such as . . . 'indisputable visual evidence,' then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record." *Id.*; *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (recognizing it is improper to defer to the trial court's fact findings when "the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony.").

As to the first two challenged fact findings, we reject Enriquez's contention that they are unsupported by the record. Mayfield testified that when he first approached the car, both Arispe and Enriquez "were nervous, avoided some eye contact," and "were both kind of answering over each other when he was talking to the driver." Mayfield further testified that Arispe's demeanor did not change when he told him he was going to get a warning and this was suspicious to Mayfield because "normally when you tell [a person he's] going to get a warning, [he'll] kind of relax." Mayfield also testified that Arispe was "nervous throughout the contact." Enriquez argues that Mayfield's testimony was contradicted by the videos, but we disagree. The videos do not show Arispe and Enriquez's facial expressions and body movements when Mayfield first approached the car and they confirm that Arispe and Enriquez were in fact "answering over each other." Additionally, neither the dash cam video nor the body cam video conclusively contradict Mayfield's testimony about Arispe's nervous demeanor after Mayfield told him he would only receive a warning. At this point, Arispe is not captured in the dash cam video, and he is partially obstructed by the door of the DPS vehicle in the body cam video. Accordingly, we must afford these fact findings almost total deference. *See Miller*, 393 S.W.3d at 263.

As to the third challenged fact finding—that Mayfield found Arispe's nervous demeanor to be consistent with someone being deceptive—we conclude it is not supported by the evidence. Nowhere in his testimony did Mayfield draw a connection between Arispe's nervous demeanor

and deception. However, the trial court made other fact findings concerning Arispe's deception, namely, that Mayfield believed that Arispe's action in "looking back at the [car] while denying consent [to search] was a sign of deception" and that Arispe informed Mayfield that "he had only been arrested for disorderly conduct," when in fact "Arispe had several felony arrests."

### *Reasonable Suspicion to Investigate Other Criminal Activity*

For reasonable suspicion to exist, there must be specific articulable facts that, when combined with rational inferences from those facts, would lead a reasonably prudent officer to suspect that a person has engaged in, is engaging in, or soon will be engaging in criminal activity. *See Hamal*, 390 S.W.3d at 306. Here, Mayfield was aware of the following specific articulable facts. When Mayfield approached the driver's side window of the car at the inception of the stop, he noticed that Arispe was nervous. Mayfield observed that Arispe's nervousness did not diminish after he was advised that he would receive only a warning for the traffic violations. Additionally, Arispe lied twice about his prior criminal record and Mayfield believed that Arispe's action in "looking back at the [car] while denying consent [to search] was a sign of deception." Mayfield explained that in his training and experience an individual who is asked about the presence of contraband will look directly at it. All of these facts were known to Mayfield before he walked over to the passenger-side door to talk to Enriquez.

"Although nervousness alone is not sufficient to establish reasonable suspicion for an investigative detention, it can do so in combination with other factors." *Id.* at 308. While a person's criminal history cannot be the sole basis for reasonable suspicion, it is also a factor that may be considered in combination with other factors in determining reasonable suspicion. *Id*. "Deception regarding one's own criminal record has also been recognized as a factor that can contribute to reasonable suspicion." *Id*.

Based on the totality of the circumstances, we conclude that Mayfield had reasonable suspicion to believe that Arispe had engaged in, was engaging in, or would soon be engaging in criminal activity. *See id*. Therefore, when Mayfield decided to approach Enriquez and confirm or dispel his suspicions about Arispe's engagement in other criminal activity, Mayfield had the required specific, articulable facts to support reasonable suspicion.[7]

Here, the trial court made an express fact finding that after learning that no K-9 unit was available, Mayfield "decided to continue his investigation and speak with" Enriquez to determine if his "story" matched Arispe's story. Mayfield testified that the reason he decided to speak to Enriquez was "to further the investigation and confirm [Arispe and Enriquez's] stories or see if they had matching stories or if things had changed." Because this finding turns on an evaluation of Mayfield's credibility, we must defer to it. *See Guzman*, 955 S.W.2d at 89.

"If, during a valid traffic stop and detention, the officer develops reasonable suspicion that the detainee is engaged in criminal activity, prolonged or continued detention is justified." *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd) (citing *Davis v. State*, 947 S.W.2d

---

[7]At the time Mayfield decided to approach Enriquez, he did not have specific, articulable facts to support reasonable suspicion as to Enriquez. At this point, all Mayfield knew about Enriquez was that he seemed nervous and had a criminal history, which was not enough to support reasonable suspicion. *See Wade v. State*, 422 S.W.3d 661, 671 (Tex. Crim. App. 2013) (stating that nervousness is a factor but not in and of itself sufficient to establish reasonable suspicion and noting that nervousness "is not particularly probative because most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of the officer."); *Hamal*, 390 S.W.3d at 308 (stating "a prior criminal record does not by itself establish reasonable suspicion but is a factor that may be considered."). Nevertheless, Mayfield soon learned additional specific, articulable facts which—when considered in conjunction with Enriquez's nervousness and criminal history—established reasonable suspicion as to Enriquez. When Mayfield approached the car, he noticed that Enriquez had put a shirt on and believed that Enriquez might be trying to conceal gang tattoos; when Enriquez exited the car, Mayfield saw a long knife on the passenger-side floorboard where Enriquez had been seated; and another officer on the scene saw numerous white pills scattered on the inside of the car and asked Enriquez about them. Based on the totality of the circumstances—Enriquez's nervousness; his criminal history, which included convictions for multiple drug offenses; Enriquez's potential concealment of gang tattoos; the presence of a knife where Enriquez had been seated; and the pills scattered in the car—we conclude that reasonable suspicion existed that Enriquez had engaged in, was engaging in, or would soon be engaging in criminal activity. *See Hamal*, 390 S.W.3d at 308 (concluding the totality of the information known to the officer—that appellant was traveling late at night, was speeding, appeared nervous, had a criminal record, had past arrests for drug offenses, had a recent drug arrest, and told the officer that she had not been in trouble before—established reasonable suspicion).

240, 244 (Tex. Crim. App. 1997)). And, under the framework provided by the United States Supreme Court: "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop." *See Johnson*, 555 U.S. at 333; *see also Lerma*, 543 S.W.3d at 190 ("An officer is also permitted to ask … passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop.").

Having developed reasonable suspicion that Arispe was engaged in criminal activity independent of the traffic violations, Mayfield was entitled to confirm or dispel his suspicions as long as he acted promptly in doing so. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."); *Martin v. State*, 565 S.W.3d 814, 821 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that under the totality of the circumstances, the State met its burden to show that the officer developed reasonable suspicion to prolong the traffic stop and investigate suspected narcotics activity). Additionally, the law permitted Mayfield to ask Enriquez about "matters unrelated to the purpose of the stop, so long as the questioning [did] not measurably extend the duration of the stop." *See Lerma*, 543 S.W.3d at 190 (citing *Johnson*, 555 U.S. at 333) "Although a detention that follows a traffic stop may become unduly prolonged, there is no rigid, bright-line rule governing the amount of time that detentions should take." *Martinez v. State*, 500 S.W.3d 456, 469 (Tex. App.—Beaumont 2016, pet. ref'd).

Applying the law to the facts presented, we conclude that Mayfield did not measurably extend the duration of the traffic stop. The dash cam and body cam videos establish that less than

three minutes elapsed from the time Mayfield finished checking for any outstanding warrants and reviewing Arispe and Enriquez's criminal histories to the time he started the pat-down search of Enriquez. During this brief time period, Mayfield asked Arispe for consent to search, which Arispe refused; conducted a pat-down search of Arispe; radioed for a K-9 unit; was told that a K-9 unit was not available; walked to the passenger-side door of Arispe's car and knocked on it; asked Enriquez to exit the car; walked with Enriquez to the front of the car; directed Arispe not to follow him and to remain standing by the DPS vehicle; and asked Enriquez about the knife on the floorboard. The facts and circumstances in this case support the conclusion that Mayfield's investigation into other criminal activity did not measurably extend the duration of the stop. *See Martin*, 565 S.W.3d at 821 (holding deputy acted diligently when he developed reasonable suspicion, questioned the driver, and learned of the passenger's drug possession about ten minutes from the inception of the traffic stop); *Willis v. State*, 192 S.W.3d 585, 591-92 (Tex. App.—Tyler 2006, pet. ref'd) (holding a twenty-five-minute detention while waiting for a K-9 unit was not unduly prolonged when the officer had reasonable suspicion); *Haas*, 172 S.W.3d at 54 n.8 (holding the officer had reasonable suspicion to prolong traffic stop and a twenty-minute wait for a canine sniff was not unreasonable under the Fourth Amendment).

Enriquez relies on *St. George v. State*, 237 S.W.3d 720, 726 (Tex. Crim. App. 2007). However, the present case is distinguishable from *St. George*. In *St. George*, the officer did not begin questioning the passenger until after he had completed a computer check on the driver and issued a traffic citation to him, which was about nine minutes into the traffic stop. *Id*. at 722. Additionally, when the officer initiated the questioning, he lacked any reasonable suspicion of criminal activity independent of the traffic violation. *Id*. Here, by contrast, Mayfield approached Enriquez before he issued a warning to Arispe and after he had reasonable suspicion that Arispe was involved in criminal activity independent of the traffic violations.

In sum, once he developed reasonable suspicion that Arispe was involved in criminal activity independent of the traffic violations, Mayfield was justified in taking some action to confirm or dispel his suspicions. Mayfield was authorized to ask Enriquez about matters unrelated to the purpose of the stop so long as the questioning did not measurably extend the duration of the stop. Mayfield acted quickly in conducting his investigation and did not measurably extend the duration of the traffic stop.

For these reasons, we hold that Enriquez's continued detention while Mayfield investigated other criminal activity did not violate the Fourth Amendment.[8] Enriquez's second issue is overruled.

### JUSTIFICATION FOR THE PAT-DOWN SEARCH

In his third issue, Enriquez argues that Mayfield's pat-down search of him violated the Fourth Amendment because it was performed to discover evidence rather than for officer safety. The crux of Enriquez's argument is that the videos show that Mayfield did not perform the pat-down search for officer safety.

"During the course of a detention, an officer may, in certain circumstances, conduct a pat-down search of an individual to determine whether the person is carrying a weapon." *Lerma*, 543 S.W.3d at 191. "The purpose behind a pat-down is to discover whether the individual is armed and dangerous." *O'Hara v. State*, 27 S.W.3d 548, 554 (Tex. Crim. App. 2000). "That need does not disappear once the person disposes of an obvious weapon, since other weapons could be in his possession but hidden from view." *Id*. "Before conducting a pat-down search, an officer need only be able to point to specific and articulable facts which, taken together with rational inferences from

---

[8]In his second issue, Enriquez also argues that the State failed to establish that Mayfield's encounter with him was consensual. We do not address this argument, which is unnecessary to final disposition of this appeal. *See* TEX. R. APP. 47.1 (requiring the court of appeals to hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to the final disposition of the appeal).

those facts, reasonably warrant the intrusion." *Id*. at 550-51. "The officer's subjective level of fear is not controlling." *Lerma*, 543 S.W.3d at 191. Furthermore, "[t]he officer need not be absolutely certain that the individual is armed." *O'Hara*, 27 S.W.3d at 551. "The issue is whether a reasonably prudent person would justifiably believe that his safety or the safety of others was in danger." *Id*.

Again, the applicable standard of review requires us to give almost total deference to the trial court's fact findings as long as they are supported by the record. *Guzman*, 955 S.W.2d at 89. Here, the trial court made the following fact findings, which are supported by Mayfield's testimony. Mayfield learned from a criminal history check that Enriquez had an extensive criminal record, including convictions for aggravated assault with a deadly weapon, felon in possession of a firearm, and manufacture and delivery of a controlled substance. Mayfield knew that he needed to proceed with caution because Enriquez, especially in light of his criminal history, might be armed. When Enriquez stepped out of the car, Mayfield saw a long-blade knife in the car close to where Enriquez had been seated and this reinforced Mayfield's concern that Enriquez might be armed. Contrary to Enriquez's argument, nothing in the videos conclusively contradicts these findings.

Based on these specific and articulable facts and the rational inferences therefrom, a reasonably prudent officer in Mayfield's situation would justifiably believe that his safety or the safety of others was in danger. *See O'Hara*, 27 S.W.3d at 551. The fact that Mayfield saw the knife in the car and not on Enriquez's person did not "alter the reality that [Enriquez] could have possessed additional weapons on his person." *See id.* at 553. Accordingly, we conclude that Mayfield was justified in conducting a pat-down search of Enriquez for officer safety. *See id.* at 554-55 (holding officer's pat-down search was justified even after the defendant discarded the "belt knife" worn on his person). Enriquez's third issue is overruled.

## SCOPE OF THE PAT-DOWN SEARCH

In his fourth issue, Enriquez argues that the pat-down search conducted by Mayfield violated the Fourth Amendment because it was excessive in scope.

"Law enforcement personnel may conduct a limited search for weapons of a suspect's outer clothing, even in the absence of probable cause, where an officer believes that the suspect is armed and dangerous to the officer or others in the area." *Balentine v. State*, 71 S.W.3d 763, 769 (Tex. Crim. App. 2002). In *Terry v. Ohio*, the United States Supreme Court, recognized that: "A search for weapons in the absence of probable cause to arrest . . . must . . . be strictly circumscribed by the exigencies which justify its initiation." 392 U.S. 1, 25-26 (1968). "Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less that a 'full' search, even though it remains a serious intrusion." *Id*. at 26. To be reasonable under the Fourth Amendment, a pat-down search must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id*. at 29. If a protective search goes beyond what is necessary to determine whether the individual is armed, it is no longer a lawful pat-down search under *Terry*. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). "If in the course of a pat-down frisk the officer satisfies himself that the suspect has no weapons, the officer has no valid reason to further invade the suspect's right to be free of police intrusion absent probable cause to arrest." *Lippert v. State*, 664 S.W.2d 712, 721 (Tex. Crim. App. 1984).

Enriquez argues that the pat-down search was excessive in scope because it was an improper "general exploratory search." *See Terry*, 392 U.S. at 30. We disagree with Enriquez's characterization of the pat-down search in this case. The body cam video establishes that the pat-down search was targeted, not general, in nature. The body cam video shows that Mayfield touched

the exterior of Enriquez's clothing and felt objects in two areas—Enriquez's left and right front pant pockets. Mayfield then limited his attention to these two areas. Initially, Mayfield asked Enriquez to empty his left front pant pocket, which contained a pack of cigarettes. Next, Mayfield asked Enriquez to empty his right front pant pocket, but Enriquez did not comply with this request. To the extent Enriquez contends that Mayfield was not permitted to give Enriquez verbal instructions during the pat-down search, we disagree. Nothing in *Terry* prohibits an officer from talking to an individual and giving verbal instructions during a pat-down search. *See id*. at 18-27 (discussing the proper scope of a protective search for weapons). Furthermore, most of the verbal instructions provided in this case were aimed at determining if the object in Enriquez's right front pant pocket was a weapon.[9]

Enriquez also argues that the pat-down search was excessive in scope because it continued after he was handcuffed. During a pat-down search, an officer is permitted to handcuff an individual if there is a reasonable belief that such restraint is necessary for officer protection. *Farmer v. State*, 47 S.W.3d 187, 190, 193 (Tex. App.—Texarkana 2001, pet. ref'd) (concluding that an officer was justified in handcuffing an individual during a pat-down search for officer safety); *see Balentine*, 71 S.W.3d at 770 (noting the appellant was handcuffed during a pat-down search). In this case, Enriquez was handcuffed in the middle of the pat-down search after he cursed, turned his body, and started moving away from Mayfield. Neither the law nor the facts support Enriquez's argument that Mayfield was required to stop the pat-down search after he handcuffed Enriquez. *See Farmer*, 47 S.W.3d at 193 (noting that the officer placed the appellant in handcuffs partway through the pat-down search after the officer felt an object and did not know if it was a weapon).

---

[9]The trial court found that Mayfield "felt [Enriquez's] right pocket," "felt something hard," "was unable to manipulate the item," and "could not identify it." Mayfield's testimony supports these findings.

Enriquez also argues that the pat-down search was excessive in scope because, in its final phase, Mayfield placed his fingers in Enriquez's pocket and touched the object before removing it. In *Balentine v. State*, an officer conducting a pat-down search of the appellant's exterior clothing felt an object he thought was a weapon. 71 S.W.3d at 770. The officer then reached into the appellant's pocket to determine if the object was in fact a weapon and instead discovered an object he recognized by touch as a bullet. *Id*. The Texas Court of Criminal Appeals held that the scope of the pat-down search was not excessive because it "did not exceed the scope of that which was necessary to determine whether [the] appellant was armed." *Id*. Thus, a pat-down search does not exceed the proper scope merely because the officer places his fingers in an individual's pocket and touches the object contained therein. *See id*.

Here, the trial court found that when Mayfield touched the outside of Enriquez's right front pocket, he felt a hard object and he was "unable to manipulate the item" and "could not identify it." Additionally, the body cam video shows that mere seconds before reaching his fingers into Enriquez's pocket and touching the unknown object, Mayfield asked, "Is it a gun or no?" In other words, Mayfield was still not satisfied that Enriquez was unarmed. Thus, when Mayfield reached into Enriquez's pocket and touched the object, he was still trying to determine if Enriquez was armed. "Once [an officer's] protective search reveal[s] an item he reasonably believe[s] might be a weapon, he [is] justified in making a more intrusive search for his own protection." *Farmer*, 47 S.W.3d at 193. Viewing the evidence in the light most favorable to the trial court's ruling, Mayfield did not exceed the proper scope of the pat-down search by reaching into Enriquez's right pant pocket to determine if the hard object contained therein was in fact a weapon. *See Balentine*, 71 S.W.3d at 770 (concluding that officer's reaching into the appellant's pocket to determine if an object was in fact a weapon did not exceed the scope of a proper pat-down search); *Worthey v. State*, 805 S.W.2d 435, 439 (Tex. Crim. App. 1991) (holding an officer's search of the interior of

the appellant's purse was reasonable when merely touching the purse's exterior was not sufficient to determine if the appellant was carrying a weapon); *McAllister v. State*, 34 S.W.3d 346, 353 (Tex. App.—Texarkana 2000, pet. ref'd) (holding an officer was justified in reaching into suspect's pocket during a pat-down search because when he touched the exterior of the pocket he felt an object that might be a weapon).

We conclude the pat-down search was not excessive in scope. Enriquez's fourth issue is overruled.

## CONCLUSION

Having overruled all of Enriquez's issues, we hold the trial court did not abuse its discretion in denying the motion to suppress. The trial court's judgment is affirmed.

Liza A. Rodriguez, Justice

PUBLISH