**Affirmed and Opinion Filed July 21, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00709-CR

**WILLIAM AUTREY, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F10-16130-Q**

## MEMORANDUM OPINION
Before Justices Bridges, Lang, and Schenck
Opinion by Justice Bridges

William Autrey appeals his aggravated robbery with a deadly weapon. A jury convicted appellant and sentenced him to seventy-five years' confinement and a $10,000 fine. In four issues, appellant argues the trial court erred in denying his motion to suppress, and the trial court erred in (1) finding appellant had no expectation of privacy because he was required to wear an ankle monitor; (2) failing to grant his motion to suppress because the arresting officer had no jurisdiction to detain, stop, or arrest appellant outside the officer's geographical jurisdiction; and (3) failing to grant his motion to suppress because his arrest, search, and seizure were without probable cause. We affirm the trial court's judgment.

On the night of April 14, 2010, fifteen-year-old J.K. was at home alone listening to music when she heard "two thumps." J.K. opened her eyes and saw "two large men" coming towards

her. One of the men wore a ski mask, and the other wore a goblin mask. Both men had guns. The man in the goblin mask "yanked [J.K.] off the couch" and took her to her parent's room where he made her sit on the floor. The man in the ski mask pointed a gun at her while the man in the goblin mask opened drawers, dumped their contents out, and asked "where the money was." The man in the goblin mask emptied a jewelry box into a black "Under Armour" bag before going upstairs and into the kitchen and returning to the bedroom. The man in the goblin mask received a text message on a Blackberry phone and "told the ski mask guy to tie [J.K.] up." The man in the ski mask tied up J.K. and placed her in a bathtub before both men left through the front door. J.K. freed herself and called her mother. Police arrived at the scene, interviewed J.K., and photographed a footprint on the front door the men had kicked in.

On April 17, 2010, Irving police officer Ary Fisher was on duty when his supervisor called him and said he wanted Fisher to meet him at a location in Irving where he would brief Fisher and other officers about "an incident that was occurring." Fisher's supervisor said "Plano – was tracking this vehicle and that it's known for burglaries and home invasions." While Fisher was driving to the designated location, a call came over the radio that "the vehicle being tracked was moving." A description of a black Cadillac Escalade with a given license plate followed. Fisher ran a registration return for the license plate which "came back out of Euless," so Fisher drove toward Euless and the west city limits of Irving. Fisher "took the best possible flight or way [he] thought the vehicle would leave, based upon the registration." Fisher positioned his car so that he could monitor traffic traveling westbound on Highway 183 while he continued to listen to the radio for updates on the location of the Escalade.

Fisher saw a black Escalade with no front license plate pass, and he immediately pulled in behind to see if the license plate matched, which it did. Fisher confirmed that his backup was nearby, and he activated his lights to stop the Escalade. The Escalade pulled off on the right

shoulder, and Fisher stopped and approached the Escalade's driver's side while other officers approached from the rear. Fisher knew the people he was approaching were "[p]ossibly armed and just committed a burglary." When Fisher reached the driver's side window, he instructed the occupants to put their hands where he could see them. The men did not immediately comply. Appellant, seated in the front passenger seat, "immediately start[ed] talking over the driver." In a "very loud" voice, appellant said "You're scaring me; what's going on? We just picked up this vehicle." Fisher interpreted appellant's loud talking as an attempt "to give information that he wants the driver to give to [police] versus what's actually the truth." Also in the Escalade were Ramon Miller and Brandon Lamont Young. Appellant was "muddy" and sweating, and all three men were dressed in black. Appellant had "a microphone earpiece, headpiece on his head."

Fisher got the driver, Young, out of the Escalade and handcuffed him because of the "threat of the possibility of them being armed," and Fisher's supervisor escorted Young back to a squad car. Appellant and Miller also got out of the Escalade. Inside the Escalade, Fisher could see "several purses and bags on the floor," one of which had jewelry visible inside. Another officer instructed Fisher that a handgun was visible on the left side of the right rear seat. When appellant got out of the Escalade, a two-way radio was visible in the front right passenger door. After appellant, Miller, and Young were handcuffed and separated to prevent them from communicating with each other, notification came over the radio that officers had found a house that had been burglarized in the "general area of where the surveillance had been taking place." At that point, from Fisher's perspective, "everybody was under arrest."

In a subsequent inventory search of the Escalade, police found another handgun under the right rear passenger seat. Police found in appellant's pocket a piece of paper with a list of addresses, including an address in Irving that was burglarized on the night appellant was arrested. Appellant was indicted on a charge of aggravated robbery with a deadly weapon.

Appellant filed a motion to suppress all evidence obtained as a result of the traffic stop. At the hearing on appellant's motion to suppress, Fisher testified the tracking of the Escalade did not help him find the Escalade. Fisher testified that, "if the tracker hadn't been there, [he] would still have been sitting up there, still watching for the same vehicle." Fisher testified he did not base his position on any information he received from the tracker. The trial court stated "I found the officer to be credible when he said that he used his hunch to decide where he was going to be based on the information he had received about the registration of the car – the address." The trial court denied appellant's motion to suppress.

At trial, appellant's accomplices Miller and Young both testified appellant wore the goblin mask during the robbery of J.K. The state introduced evidence that appellant's shoe was consistent with the shoe print found on J.K.'s door. DNA analyst Kimberly Clement that, to a reasonable degree of scientific certainty, appellant was the source of the DNA profile obtained from the goblin mask. A jury convicted appellant of aggravated robbery with a deadly weapon, and this appeal followed.

In his first issue, appellant argues the trial court erred in denying his motion to suppress because police failed to obtain valid search warrants prior to tracking appellant's location through GPS mobile and cell phone tracking.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to a trial judge's determination of historical facts. *Id.* The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* The judge is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because he has the opportunity to observe the witness's demeanor and appearance. *Id.* If the trial judge makes express findings of fact, we

view the evidence in the light most favorable to his ruling and determine whether the evidence supports these factual findings. *Id.* When findings of fact are not entered, we must view the evidence in the light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Id.* Second, we review a trial court's application of the law of search and seizure to the facts de novo. *Id.* We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.*

Here, Fisher was on duty when his supervisor called and told him about a vehicle that was "known for its burglaries and home invasions." A description of the vehicle came over the radio, along with its license plate. Acting on his own initiative, Fisher ran a registration return on the license plate, which "came back out of Euless." Fisher "took the best possible flight or way [he] thought the vehicle would leave, based upon the registration." Fisher positioned his car so that he could monitor traffic traveling westbound on Highway 183. Fisher saw a black Escalade with no front license plate, and he pulled in behind it to see if the license plate matched that of the vehicle police were seeking. Fisher pulled the Escalade over and approached the driver's side window and told the three men in the Escalade to keep their hands where he could see them. The men did not immediately comply; instead, appellant, in a "very loud" voice, said "You're scaring me; what's going on? We just picked up this vehicle." All three men were dressed in black, and appellant was muddy and sweating. All three men were taken out of the car and handcuffed for officer safety. After the men were out of the car, officers could see in plain view a handgun, purses, and jewelry in the Escalade. When notification came over the radio that officers had found a house that had been burglarized in the "general area of where the surveillance had been taking place," appellant and the other men were placed under arrest. Thus, the record shows Fisher did not rely on the GPS or cell phone tracking in determining where to

wait and watch for appellant. Further, any taint of the allegedly unconstitutional GPS tracking search had dissipated by the time Fisher stopped the Escalade for a traffic violation and discovered in plain view evidence of a burglary. *See State v. Jackson*, No. PD-0823-14, 2015 WL 4024293, at *8 (Tex. Crim. App. July 1, 2015). Thus, the trial court did not err in denying appellant's motion to suppress evidence based on the argument that the evidence was obtained by tracking. *See Valtierra*, 310 S.W.3d at 447. We overrule appellant's first issue.

In his third issue, appellant argues the trial court erred in denying his motion to suppress because Fisher had no jurisdiction to detain, stop, or arrest appellant outside Fisher's geographical jurisdiction. Specifically, appellant argues Fisher, a City of Irving police officer, was in Tarrant County, outside his jurisdiction, when he stopped the Escalade.

Article 14.03(g)(2) of the code of criminal procedure provides:

> A peace officer . . . who . . . is outside of [his] jurisdiction may arrest without a warrant a person who commits any offense within the officer's presence or view, except that an officer . . . who is outside of [his] jurisdiction may arrest person for a violation of Subtitle C, Title 7, Transportation Code, only if the offense is committed in the county or counties in which the municipality employing the peace officer is located.

TEX. CODE CRIM. PRO. art 14.03(g)(2). An "arrest" under article 14.03 is not limited to a formal, custodial arrest. *State v. Purdy*, 244 S.W.3d 591, 593 (Tex. App.—Dallas 2008, pet. ref'd). Thus, the provisions of article 14.03 also apply when an officer temporarily detained a person based on reasonable suspicion. *Id.* At the time of the offense, the transportation code required both a front and rear license plate. *See* Act of May 23, 1995, 74th Leg., R.S., ch. 165, § 1, 1995 Tex. Gen. Laws 1025, 1523 (West) (former TEX. TRANSP. CODE ANN. § 502.404 redesignated as TEX. TRANSP. CODE ANN. § 502.473) ("A person commits an offense if the person operates on a public highway during a registration period a passenger car or commercial motor vehicle that does not display two license plates, at the front and rear of the vehicle . . . ."). Section 502.404, the provision requiring a front license plate at the time of the offense, as well as section 502.473,

the current provision, are found in Subtitle A, Title 7 of the transportation code. *See id.*; TEX. TRANSP. CODE ANN. § 502.473 (West Supp. 2014). Thus, Fisher was authorized to detain the Escalade outside his jurisdiction based upon the failure to display a front license plate. *See* TEX. CODE CRIM. PRO. art. 14.03(g)(2); *Purdy*, 244 S.W.3d at 593. The trial court did not err in denying appellant's motion to suppress on this basis. *See Valtierra*, 310 S.W.3d at 447. We overrule appellant's third issue.

In his fourth issue, appellant argues the trial court erred in denying his motion to suppress because his arrest, search, and seizure were made without probable cause. In making this argument, appellant again complains Fisher was outside his jurisdiction and had no authority to stop appellant's car for not having a front license plate. Appellant also renews his argument that, because of "the continuous tracking of [appellant] without a valid warrant, the resulting stop and arrest prior to confirming that of burglary had been committed" constituted an illegal search and seizure. Appellant characterizes his being removed, handcuffed, and placed in a police car as an arrest without probable cause. However, an investigative detention does not evolve into an arrest simply because the suspect is escorted to a patrol car and handcuffed. *See Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002). An officer may do what is reasonably necessary to ensure his own safety while investigating a suspect's possible involvement in a crime. *See id.* We have already determined that Fisher was authorized to detain appellant for not having a front license plate outside his jurisdiction, and Fisher did not rely on "continuous tracking" in detaining the Escalade. Fisher approached the Escalade and told appellant and the other two men inside to keep their hands where he could see them. Instead, appellant and the other men did not immediately comply, and appellant began asking questions in a "very loud" voice. Fisher knew the Escalade was "known for its burglaries and home invasions." Fisher did not place the men under arrest until after it was confirmed that a burglary had occurred in the area where

–7–

surveillance of the Escalade had taken place. Also by that time, officers had discovered a gun, jewelry, and purses in the Escalade. Under these circumstances, we cannot conclude appellant was arrested without probable cause. The trial court did not err in denying his motion to suppress on this basis. *See Valtierra*, 310 S.W.3d at 447. We overrule appellant's fourth issue.

In his second issue, appellant argues the trial court erred in finding he had no expectation of privacy because he was required to wear an ankle monitor as a condition of a bond set in another case. In making this argument, appellant again argues the cell phone and GPS tracking were conducted without a warrant and therefore prohibited as an unlawful search. However, because we have concluded the record supports a determination that Fisher did not use the tracking information, we need not address the issue of whether appellant had no expectation of privacy because he was required to wear an ankle monitor. We overrule appellant's second issue.

We affirm the trial court's judgment.


Do Not Publish
TEX. R. APP. P. 47.2(b)

/David L. Bridges/

130709F.U05

DAVID L. BRIDGES
JUSTICE

–8–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM AUTREY, Appellant

No. 05-13-00709-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-16130-Q.
Opinion delivered by Justice Bridges.
Justices Lang and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 21, 2015.