# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-22-00745-CR

---

**Francisco Llanas, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 450TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-DC-20-300570, THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING**

---

### O P I N I O N

Appellant Francisco Llanas pleaded guilty to murder and was sentenced by the trial court to thirty years' confinement.[1]  *See* Tex. Penal Code § 19.02(b)(1), (c).  On appeal, he contends that the trial court abused its discretion by denying his motion to suppress evidence obtained from a search of his cell phone.  We affirm the trial court's judgment of conviction.

---

[1] In exchange for Llanas's guilty plea, the State agreed to cap the available punishment range at forty years' confinement.  However, despite the existence of a plea bargain, the trial court has given Llanas permission to appeal.  *See* Tex. R. App. P. 25.2(a)(2)(B); *Shankle v. State*, 119 S.W.3d 808, 813 (Tex. Crim. App. 2003) (explaining that "[s]entence-bargaining may be for binding or non-binding recommendations to the court on sentences, including a recommended 'cap' on sentencing").

# BACKGROUND[2]

The charge in this case arose from a series of drive-by shootings in March 2020 carried out in the Austin area as part of a feud between two rival gangs. On March 13th, officers responded twice—shortly after midnight and again at approximately 11 p.m.—to shootings at a duplex on East Stassney Lane. After each shooting, they recovered fired 9mm cartridge casings from the road in front of the duplex. During the second shooting, 19-year-old Oscar Jaimes, who police determined had no gang affiliation or criminal record, was shot. He was taken to a hospital but later died of his injuries.

Matthew Gonzalez, a resident of the duplex, told Detective Will Ray that he believed that he had been the intended target and that he knew who was responsible for the shootings. Gonzalez showed Detective Ray a Facebook profile for "Javier Garcia," which officers later determined was a pseudonym used by Llanas. Detective Ray sent screenshots of the profile—including one depicting Llanas holding two pistols in one hand and a stack of money in the other—to Detective Christopher Vanlandingham.

At approximately 2:45 a.m. on March 14th, Gonzalez met Detective Vanlandingham at Austin Police Department's Homicide Office and told him that Llanas thought Gonzalez was responsible for a recent burglary at Llanas's house on Dove Drive, which Gonzalez identified for officers. Detective Vanlandingham located a report for the burglary that listed Llanas as a resident of the house and matched his booking photograph to photographs posted to the Javier Garcia profile.

---

[2] These facts, which Llanas does not dispute, are taken from the probable-cause affidavit sworn by Detective Christopher Vanlandingham in support of the warrant to search Llanas's cell phone.

During the meeting with Detective Vanlandingham, Gonzalez attempted to access a Facebook post made by Llanas the previous afternoon. However, both the post and the photograph shown to Detective Ray had been deleted from Llanas's profile. Instead, Gonzalez provided Detective Vanlandingham with screenshots of the post, which Gonzalez had earlier sent to a friend:



Detective Vanlandingham determined that the "Unc Lu" profile belonged to Luis Panchi, with whom Gonzalez had argued after he refused to pay Panchi for a marijuana purchase. Gonzalez explained that "Check the score" meant that Llanas and Panchi "were winning" and that Llanas "was bragging about the shooting." Gonzalez also explained that "slang that iron" meant "shooting" and that "tn" was an abbreviation for "tonight." He

understood the comments to mean that Llanas and Panchi "were planning on coming back to shoot at his residence again tonight."

A third drive-by shooting occurred at Gonzalez's East Stassney duplex on March 19th. Police obtained surveillance video from the residence on which thirteen shots could be heard, and an officer collected ten fired 9mm cartridge casings from the scene. Detective Vanlandingham was later notified that these cartridge casings had been fired by the same gun as had those recovered from the March 13th shootings.

At 1:23 a.m. on March 22nd, officers responded to a house on Knottingwood Court following a report of approximately twenty shots fired during a fourth drive-by shooting. They recovered multiple fired cartridge casings from the street and observed around thirty bullet holes in the house's exterior. After failing to make contact with the house's occupants, officers forced entry, and Officer Adam Curvin observed a shotgun next to a couch in the living room, "multiple projectiles" on the floor, and small baggies of marijuana throughout the house. In a bedroom, Officer Curvin saw an ID belonging to Llanas, for whom Officer Curvin—a member of the Violent Crimes Task Force—had been searching pursuant to a warrant for an unrelated aggravated assault with a deadly weapon. Officer Curvin recognized the Knottingwood house as the location in a photograph posted to Llanas's Facebook profile, in which Llanas stood on a deck holding a handgun. The photograph was captioned, "PISTOL PACKING HAPPY TIMES DREAMING ABOUT SLANGING SUM IRON."

Less than an hour after the shooting on Knottingwood Court, officers were called to a fifth drive-by shooting, this time at Llanas's house on Dove Drive. Llanas's mother told officers that her house "was struck"; that she believed Llanas was the intended target; and that he

4

was often with Oliver Garcia, who officers determined resided at the Knottingwood house, where the fourth shooting had occurred.

Police executed a search warrant for the Knottingwood house at approximately 9 a.m. on March 22nd. In the bedroom in which Officer Curvin had seen Llanas's ID, Detective Vanlandingham discovered a 9mm Glock 19 pistol and two suitcases with tags on which were written Llanas's name and LAX, the airport code for the Los Angeles International Airport.

On March 23rd, members of the U.S. Marshals Lone Star Fugitive Task Force arrested Llanas at an apartment on Circle S Road. While conducting a protective sweep of the apartment, a member of the Task Force observed a handgun case for a Glock and a third travel tag bearing Llanas's name and LAX. The officer frisked Llanas for weapons and felt a cell phone charging cord but not a cell phone. When the officer asked Llanas if he had a cell phone that he wished to take with him, he replied that his phone was inside the apartment and that he did not want it.

Anthony Villegas, who had been inside the apartment at the time of Llanas's arrest, told officers that he lived there and that he had seen Llanas holding a pistol in the apartment the previous night. While police were awaiting a search warrant for the apartment, an officer asked Villegas whether he knew where Llanas's phone was. Villegas responded that he had the phone and gave it to the officer.

Detective Vanlandingham applied for a warrant to search Llanas's phone. In the probable-cause affidavit accompanying the search-warrant application, Detective Vanlandingham averred the above facts and included the screenshot of the Javier Garcia Facebook post. The affidavit also included boilerplate language regarding his knowledge that

5

"criminal suspects use their cellular device[s] to communicate with others about their activities"; that "a cellular device and the applications installed on the device track the location of the device, both when the device is in use and when it is idle"; that "people use their cellular device for multiple forms of communications including phone calls, text messages, emails, and social network posts"; and that these records can be retrieved from cell phones. Further boilerplate language emphasized the possibility that a cell phone might contain evidence of possible accomplices, the evidentiary importance of cell phones' data storage capacity, and the likelihood of cell phones containing various applications that "can shed light on many aspects of the life of their user."

Llanas moved to suppress all evidence obtained from a search of the phone, arguing that "[i]n the recitation of probable cause, [Detective Vanlandingham] does not offer a single link between the cell phone that [was] seized, and the [murder] that occurred March 13, 2020." Llanas argued that Detective Vanlandingham had provided no evidence that the cell phone had been used to plan, discuss, commit, or conceal a crime; that the "need to search [Llanas's] cell phone is expressed using boilerplate language"; and that the Court of Criminal Appeals deemed this type of language insufficient in *State v. Baldwin*. *See* 664 S.W.3d 122, 123 (Tex. Crim. App. 2022).

The trial court denied the motion after a non-evidentiary hearing and did not make findings of fact and conclusions of law. Llanas subsequently pleaded guilty to murder and, following a hearing on punishment, was sentenced by the trial court to thirty years' confinement. This appeal followed.

## DISCUSSION

In his sole issue on appeal, Llanas contends that the trial court abused its discretion by denying his motion to suppress. Specifically, he argues that Detective Vanlandingham's affidavit failed to allege facts sufficient to establish probable cause because it "did [not] contain sufficient facts connecting [the phone] to the offense, or that [the phone] contained evidence of the offense."

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (citing *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002)). The ruling will be reversed "only if it is arbitrary, unreasonable, or outside the zone of reasonable disagreement." *State v. Heath*, 696 S.W.3d 677, 689 (Tex. Crim. App. 2024). In general, we apply a bifurcated standard of review. *Id.* On the one hand, we afford almost total deference to the trial court's determination of historical facts and its rulings on mixed questions of law and fact, especially when those determinations are based on an assessment of credibility and demeanor. *State v. Torres*, 666 S.W.3d 735, 740 (Tex. Crim. App. 2023). On the other, "[w]e review de novo legal questions and mixed questions that do not turn on credibility and demeanor, such as facts of a case that would establish probable cause." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, which must be upheld if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.*

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized." U.S. Const. amend. IV.[3] "Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location." *Baldwin*, 664 S.W.3d at 130 (citing *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012)). The standard is "flexible" and "non-demanding," and the duty of reviewing courts is "to ensure a magistrate had a substantial basis for concluding that probable cause existed." *Id.*; *see Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). "Even in close cases," we must afford the magistrate's probable-cause determination, including any implicit findings, "great deference" so as "to encourage police officers to use the warrant process." *Baldwin*, 664 S.W.3d at 130 (citing *Duarte*, 389 S.W.3d at 354; *State v. McLain*, 337 S.W.3d 268, 271–72 (Tex. Crim. App. 2011)). We must not invalidate a warrant by interpreting an affidavit in a hyper-technical rather than commonsense manner and, when in doubt, "should defer to all reasonable inferences a magistrate could have made." *Id.* (citing *McLain*, 337 S.W.3d at 271–72; *Rodriguez v. State*, 232 S.W.3d 55, 61 & n.25 (Tex. Crim. App. 2007)).

In determining whether an affidavit establishes probable cause for a search warrant, both the issuing court and reviewing court must look only within the four corners of the affidavit. *Id.* (citing *McLain*, 337 S.W.3d at 271–72). "While a magistrate may not baselessly presume facts that the affidavit does not support, the magistrate is permitted to make reasonable inferences from the facts contained within the affidavit's 'four corners.'" *Foreman v. State*,

---

[3] We do not understand Llanas to have raised an issue under the Texas Constitution on appeal. *See* Tex. Const. art. 1, § 9. To the extent that he intended to do so, we will not address the issue because he does not provide argument or authority concerning the protection offered by the Texas Constitution or how that protection differs from the protection offered by the United States Constitution. *See State v. Toone*, 872 S.W.2d 750, 752 n.4 (Tex. Crim. App. 1994); *Coggin v. State*, 123 S.W.3d 82, 86 (Tex. App.—Austin 2003, pet. ref'd).

613 S.W.3d 160, 164 (Tex. Crim. App. 2020). However, "conclusory allegations alone are insufficient to support a finding of probable cause," and the magistrate cannot merely ratify "the bare conclusions of others." *Baldwin*, 664 S.W.3d at 132 (quoting *Gates*, 462 U.S. at 239).

Absent exceptional circumstances that are inapplicable to this case, "when the State seeks to search a cellphone pursuant to a lawful arrest, it must obtain a warrant that, among other things, identifies the cellphone to be searched and states the name of its owner or possessor." *Harmel v. State*, 597 S.W.3d 943, 963 (Tex. App.—Austin 2020, no pet.); *see* Tex. Code Crim. Proc. art. 18.0215(a) ("A peace officer may not search a person's cellular telephone or other wireless communications device, pursuant to a lawful arrest of the person without obtaining a warrant under this article.")[4] A judge may issue a warrant under article 18.0215 only on a peace officer's application, which must state the facts and circumstances that provide the applicant with probable cause to believe that: (1) criminal activity has been, is, or will be committed and (2) searching the telephone or device is likely to produce evidence in the investigation of the criminal activity described. Tex. Code Crim. Proc. art. 18.0215(c)(5).

In two recent cases—*Baldwin* and *Stocker v. State*—the Court of Criminal Appeals addressed the nexus between a cell phone and criminal activity required by article 18.0215 as well as the use of boilerplate language in affidavits supporting a warrant under the article. *See Stocker v. State*, 693 S.W.3d 385, 387–88 (Tex. Crim. App. 2024); *Baldwin*, 664 S.W.3d at 123.

---

[4] Although subsection (b) of article 18.0215 was amended in 2023, subsections (a) and (c) are unchanged from the previous version of the article, which was effective at the time the facts underlying this case occurred. *See* Act of May 28, 2023, 88th Leg., R.S., ch. 861, sec. 12.003, 2023 Tex. Sess. Law Serv. 2673, 2721–22 (codified at Tex. Code Crim. Proc. art. 18.0215(b)).

Officers discovered Baldwin's cell phone during a consensual search of his vehicle as part of a murder investigation. *Baldwin*, 664 S.W.3d at 124. He refused to consent to a search of the phone, and officers applied for a search warrant. *Id.* In a supporting affidavit, an officer alleged facts connecting Baldwin's vehicle to the murder and provided "generic, boilerplate language about cell phone use among criminals." *Id.* at 124, 134. Noting the paucity of case law concerning such boilerplate language, the Court agreed with lower courts that have approved of its use in affidavits for warrants to search cell phones when the language is "coupled with 'other facts'" establishing probable cause. *Id.* at 134; *see Diaz v. State*, 604 S.W.3d 595, 598, 603–04 (Tex. App.—Houston [14th Dist.] 2020) (excluding boilerplate language and finding sufficient nexus between burglary and three cell phones in defendant's possession because cell phone parts were recovered from burgled house, defendant's DNA tied him to crime scene, and he was associated with at least two phone numbers), *aff'd*, 632 S.W.3d 889 (Tex. Crim. App. 2021); *Walker v. State*, 494 S.W.3d 905, 909 (Tex. App.—Houston [14th Dist.] 2016, pet ref'd) (finding that "[a] substantial basis for probable cause rests in the allegations that [defendant] and the complainant had been communicating via [defendant]'s cell phone, planning robberies around the time that the complainant was killed while being robbed of possessions later found in [defendant]'s possession").

However, the Court stressed that the affidavit in question contained "no facts . . . that tie [Baldwin's] cell phone to the offense" and "nothing about the phone being used before or during the offense." *Baldwin*, 664 S.W.3d at 134–35. The Court concluded that

> the magistrate erred by substituting the evidentiary nexus for the officer's training and experience and generalized belief that suspects plan crimes using their phones. The boilerplate language in itself is not sufficient to provide probable cause in this case, nor does the remaining affidavit set forth details in sufficient

10

facts to support probable cause. Considering the whole of the affidavit, there is no information included that suggest anything beyond mere speculation that [Baldwin]'s cell phone was used before, during, or after the crime.

*Id.* at 135.

The Court in *Stocker* clarified that the nexus required under article 18.0215 does not have to be between the cell phone and "the specific offense at trial." 693 S.W.3d at 388. The appellate court, citing *Baldwin*, had concluded that an affidavit was insufficient to establish probable cause because it contained "nothing about a cell phone being used before, during, or after the *charged offense*" and had explained that "[t]he offenses described in the affidavit are those for which [the defendant] was not tried and convicted here." *Stocker v. State*, 656 S.W.3d 887, 902 (Tex. App.—Houston [14th Dist.] 2022), *rev'd*, 693 S.W.3d at 388 (emphasis added). Rejecting the lower court's interpretation of *Baldwin*, the Court of Criminal Appeals explained that showing that a cell phone's owner used the phone before, during, or after the crime being prosecuted is only "[o]ne way to establish the required 'nexus' when it comes to a warrant affidavit to search a cell phone" and is "not always required before a magistrate may find that a search warrant affidavit 'state[s] facts and circumstances that provide . . . probable cause to believe that . . . searching the telephone . . . is likely to produce evidence in the investigation of' certain criminal activity." *Stocker*, 693 S.W.3d at 387–88 (quoting Tex. Code Crim. Proc. art. 18.0215(c)(5)(B)).

Detective Vanlandingham's affidavit alleged facts tying both Llanas and his cell phone to the rash of drive-by shootings, including the one in which Jaimes was killed. Officers determined that the fired 9mm cartridge casings from the first three shootings were fired by the same gun. A bedroom in the Knottingwood house contained a 9mm Glock pistol, Llanas's ID,

11

and suitcases with travel tags bearing his name. And in the apartment where he was arrested, officers discovered an empty Glock handgun case and a third travel tag with his name. A resident of the apartment, Villegas, told officers that he had seen Llanas brandishing a handgun the night before. Moreover, the fifth shooting was at Llanas's mother's house, and she informed police that she believed Llanas had been the intended target and directed them to the Knottingwood house, where another shooting had previously occurred.

The magistrate could have reasonably inferred that there was a fair probability that the cell phone contained evidence associated with Llanas's use of social media. *See Rodriguez*, 232 S.W.3d at 62. Gonzalez, a resident of the duplex where three of the shootings took place, identified Llanas as the shooter and showed officers a Facebook profile belonging to Llanas, from which they obtained a photograph of him holding pistols and cash; a second photograph, in which he held a handgun, that was captioned "PISTOL PACKING HAPPY TIMES DREAMING ABOUT SLANGING SUM IRON"; and an exchange with Panchi, in which Llanas bragged about one shooting and planned another. During the suppression hearing, the State argued that the magistrate could have reasonably inferred that Llanas had used his cell phone to take the photographs and make the Facebook posts, and the trial judge agreed that "the inference kind of slaps you in the face here."

We likewise agree that the magistrate could have reasonably inferred that Llanas used his cell phone to upload the photographs, make the posts, and subsequently delete both. Viewed in the light most favorable to the trial court's denial of the motion to suppress, the probable-cause affidavit indicates that Llanas—who appears to have been living out of suitcases—was frequently on the move from March 13th to 23rd and was therefore likely to have been using his cell phone to access social media. Llanas's comments to his "Check the score

12

board" post, a copy of which was included in the affidavit, contained emoji, from which the magistrate could have concluded they had been written using a cell phone. As the affidavit's boilerplate language acknowledged, "people use their cellular device[s] for . . . social network posts." *See State v. Huynh*, 683 S.W.3d 803, 812 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (mem. op.) (stating that boilerplate language in affidavit can provide "a foundation" for particularized facts establishing probable cause). Moreover, multiple photographs posted to Llanas's Facebook account showed him holding handguns, and officers discovered a Glock pistol with Llanas's ID card and belongings at the Knottingwood house and an empty Glock case at the apartment where he was arrested. The magistrate could have reasonably inferred that the photographs had been taken and uploaded using Llanas's cell phone, which was also recovered from the apartment. Additionally, the magistrate could have reasonably inferred that Llanas's cell phone would contain communications between him and Panchi discussing or planning the shootings, whether on social media or by text message. *See Baldwin*, 664 S.W.3d at 130, 135 (recognizing that nexus can be established by evidence that suspects planned crime over multiple days or communicated about it by phone); *Walker*, 494 S.W.3d at 909. Indeed, the fact that Llanas did not want to take his phone with him at the time of his arrest is additional evidence from which the magistrate could have reasonably inferred that it contained evidence of a shooting.

Furthermore, despite Llanas's argument to the contrary, there was ample evidence from which the magistrate could have reasonably inferred that the cell phone handed over by Villegas belonged to Llanas. Llanas had a cell phone charging cord but no phone in his pocket, and he told an officer that his phone was inside the apartment. Villegas stated that the phone was Llanas's.

Confining our review to the four corners of the affidavit and affording the magistrate great deference, we conclude that Detective Vanlandingham's affidavit provided the magistrate with a substantial basis for finding that probable cause existed to believe that searching Llanas's cell phone was likely to produce evidence in the investigation of the drive-by shootings and Jaimes's death. Tex. Code Crim. Proc. art. 18.0215(c)(5); *Baldwin*, 664 S.W.3d at 131–32; *Parker v. State*, 663 S.W.3d 766, 771 (Tex. Crim. App. 2022); *Foreman*, 613 S.W.3d at 163–64. We overrule Llanas's only issue on appeal.

## CONCLUSION

Having overruled Llanas's sole issue on appeal, we affirm the trial court's judgment of conviction.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed: April 11, 2025

Publish